ALBANY,
January, 1823.

SMEDES
v.
UTICA BANK.

A. K. and G. M. SMEDES *against* THE PRESIDENT AND DIRECTORS OF THE BANK OF UTICA.

*Where a promissory note is endorsed, and delivered to a bank for collection, there is an implied undertaking on the part of the bank, in case the note is not paid, to give notice of the default of the maker, to all the endorsers. And if they neglect to give such notice, the holder, or owner of the note, may maintain assumpsit against them for the nonfeasance; the deposit of the note, and the probable profit to arise from the money remaining in bank after it is paid, being a beneficial act, and affording a good consideration to support the promise.*

*A bank, in such case, is bound to employ a competent and faithful person to give the requisite notice to the endorsers, otherwise it is answerable for his default; but if the note is delivered to a notary, who is sworn into public office, to protest, and give notice thereof to the endorsers, it seems, that the bank is not liable for his neglect or default.*

*An endorser is entitled to strict notice, and if he resides in the same place, it must be personal, or left at his dwelling house, or place of business.*

THIS was an action of *assumpsit*, tried at the *Ontario* circuit, in *June*, 1821, before Mr. Justice *Yates*. The declaration contained three counts, besides the general money counts. The *first* count stated, that in consideration of certain reasonable fees and rewards to be paid by the plaintiffs, the defendants undertook, and promised to give notice of the non-payment of a certain promissory note, (setting it forth,) left with them by the plaintiffs for collection, at their office, called the *Utica Branch Bank*, at *Canandaigua*, to *John C. Spencer*, one of the endorsers of the note. The *second* count was substantially the same. The *third* count alleged, that in consideration that the plaintiffs would, at the request of the defendants, endorse and deliver the note in question to them, to collect and receive the money, for the use of the plaintiffs, the defendants undertook, and promised, in default of payment by the makers of the note, to cause due notice thereof to be given to the endorsers, &c. That the plaintiffs delivered the note to the defendants accordingly; but the defendants did not cause due notice of the non-payment to be given to *J. C. Spencer*, the first endorser thereof, but wholly failed, and made default, &c.

The note in question, was dated, *Canandaigua*, 12th of *April*, 1817, made by *Underhill & Seymour*, for 1,237 dollars, payable at the *Utica Branch Bank*, to *John C. Spencer*, or order, six months after date, with interest. The declaration charged, that by reason of the default and neglect of the defendants, the plaintiffs, who had prosecuted a suit against the first endorser, in the Supreme Court, for want of due notice to such endorser, were defeated in their suit, and judgment was given against them, in favour of the endorser, *J. C. S,* in *October*, 1819, for his costs, which

they had paid, and the plaintiffs had also to pay their own costs, &c.

It was proved, that the plaintiffs, who are merchants in the city of *New-York*, sent the note in question to a person in *Canandaigua*, for collection, who deposited it in the *Ontario Bank*, for that purpose. The cashier of the *Utica Branch Bank of Canandaigua*, (*O. Seymour*,) testified, that the note in question, endorsed by *J. C. Spencer*, and the plaintiffs, was left at the *Utica Branch Bank*, by the cashier of the *Ontario Bank*, which transacts business in the same place. That the note was regularly entered in the books of the *Utica Branch Bank*; and not being paid when it became due, it was handed to the agent of *T. Childs*, the notary of the *Utica Bank*, to protest, and give notice of non-payment, in the same manner as other notes belonging to the bank were delivered to him. *Childs* was the only notary in the village at that time. The bank received no fees, nor did they derive any pecuniary advantage whatever from notes lodged with them for collection. That the bank have nothing to do with the notary, and consider their duty discharged, where a note is unpaid, by handing it to the notary to be protested; nor is it any part of the business of the bank to give notice of non-payment to the endorsers. It derives no benefit whatever from the notary's fees. *H. B. Gibson*, cashier of the *Ontario Bank*, testified, that it is the uniform custom of the bank to give notice to all the endorsers of a note, or the drawers of a bill, as the case might be. He considered this to be the established custom, and general understanding. The bank appoint their own notary, with whom the customers of the bank, who have lodged notes, have nothing to do.

The plaintiff offered to produce other witnesses conversant with the business of banks, to prove the same fact, as to the established custom and understanding; but the Judge deemed it unnecessary. The plaintiffs produced an exemplification of the judgment in the suit brought by them against *Spencer*, on the note, &c. It was, also, proved by *Spencer*, that he never received any notice of non-payment from the bank, or

ALBANY,
January, 1823.

SMEDES
v.
UTICA BANK.

from the notary.   The makers of the note became insol-vent.

J. *Mower*, a witness for the defendants, testified, that he was the agent of *Childs*, the notary of the *Utica Bank*, and employed by him to give notice of the protest of notes not paid at the bank, and was paid by the notary for his ser-vices.   That he received no compensation from the bank ; and was a clerk in their *Branch Bank* at *C.*   That the note in question fell due on the 14th of *February*, 1818, on the evening of which day it was protested for non-payment, and he delivered a notice of the protest, at the post office, or in the law office of *J. C. Spencer*, but which he could not tell.   He, also, on the same evening, put a notice in the post office at *C.*, directed to the plaintiffs at *New-York.* Mr. *Spencer*, at the time, was at *Washington*, and his law business was transacted by his partner, Mr. *Wilson*, at his office in *C.*   That *Childs*, the notary, was absent at the time, and knew nothing of the business, the whole of which was transacted by the witness.   That in the afternoon of the day of the protest, the witness called on Mr. *Wilson*, and asked him if certain funds were applicable to the pay-ment of the note, and *W.* answered, that he had no instruc-tions on the subject.   The witness had no recollection that he ever left at the post office a notice of protest, addressed to an inhabitant of the village of *C.*, and he believed the notice of the protest of the note in question was left at Mr. *Spencer's* office ; but he could not positively say, that it was not put in the post office.   *H. Jamieson*, a witness for the defendants, testified, that he was a clerk in the office of Mr. *Spencer* at *C.*, in the winter of 1817, and 1818, and heard *Mower* ask Mr. *Wilson* whether the funds deposited by him were to apply to the note ; and Mr. *Wilson* said he had no instructions on the subject.   " That on that occasion, the wit-ness saw a notice of protest addressed to Mr. *Spencer*, as endorser of a note of *Underhill & Seymour*, for about 1,200 dollars, at Mr. *Spencer's* office, but he did not recollect the day, or time of the day."   All the testimony as to the notice at *Spencer's* office, was objected to by the plaintiffs' counsel, on the ground, that the notice itself was not produced, nor any

proof of notice given to produce it, or any account of it. The Judge admitted the evidence, subject to the objection.

A verdict was taken for the plaintiffs, subject to the opinion of the Court, on a case containing the facts above stated.

*S. M. Hopkins*, for the plaintiffs, contended, 1. That the defendants had undertaken to give due notice of the non-payment of the note to *Spencer*, the endorser, as was alleged in the third count in the declaration. This undertaking was made out, either by the general usage and custom of the country, that banks who receive notes for collection are, in case of non-payment, to give due notice to the endorsers, of which general usage the Court will take notice; or by the proof of the usage given at the trial; or by the proof of the special undertaking of the defendants appearing in the case. Where a person, even gratuitously, undertakes to perform a service, he must go on and complete the performance, or be liable for the damages arising from his neglect. (2 *Johns. Cases*, 92. 95, 96.) That it was the general usage and custom for banks, in this country, to give notice of the non-payment of notes and bills left with them for collection, and to employ notaries for that purpose, was fully recognised by the Court, in the case of the *Utica Bank* v. *Smith*, (18 *Johns. Rep.* 230—240.) The custom of merchants varies in different countries, in order to accommodate itself to particular courses of business, or other local circumstances. (3 *Dallas*, 368—424.) In *Ireland* v. *Kip*, (10 *Johns. Rep.* 491.) it was held to be the duty of the notary of the bank to give notice.

2. Have the defendants performed their duty, and given legal and effectual notice of non-payment to the endorser? That they have not, is most clearly proved. *Spencer* deposes that he, in fact, received no notice, and the evidence is not sufficient to show that notice was left at his office. The giving of notice being a condition precedent, to fix an endorser or surety, the proof of it must be clear, strict, and affirmative. It is plain, that neither *Wilson*, nor *Jamieson*, the persons in the office of Mr. *Spencer*, believe that notice was left there, even supposing that a proper place at which to

leave a notice.   An *endorser* of a note is entitled to strict notice.   (*French* v. *Bank of Columbia*, 4 *Cranch*, 141.) If any notice was left at the office of the endorser, it does not appear what it was.   Besides, the judgment in the suit brought by the plaintiffs against the endorser is conclusive, that he did not receive due notice.

*N. Williams & Storrs*, contra, insisted, 1. That the plaintiffs having declared for a *nonfeasance*, and given evidence only of a *misfeasance*, had not maintained their action. There is no proof of a consideration to support an *assumpsit*. If any action lies, it is an action on the case.   Where the undertaking is voluntary and gratuitous, *assumpsit* does not lie for the non-performance. (*Thorn* v. *Deas*, 4 *Johns. Rep.* 97. 99.   1 *Chitty's Pl.* 487. 295.   5 *Term Rep.* 143.)

2. Even on the ground of misfeasance, the defendants are not liable.   It was no part of the duty of the defendants to give notice to the endorsers.   They were bound merely to receive the money, if paid, or, in case of non-payment, to return the note to the plaintiffs, or to deliver it to a notary, or proper officer.   There was no contract, express or implied, between the plaintiffs or defendants.   The note was received by the defendants from the *Ontario Bank*, with the endorsement of the plaintiffs.   An agent or bailee, without reward, is bound to use only ordinary diligence.   (1 *Johns. Cases*, 174.   *Cowp.* 479.   6 *Term Rep.* 12.   14 *Johns. Rep.* 232, 233, 234.)

3. But the evidence in the case shows, that the defendants did exercise due diligence, and that every thing was done which was necessary to charge Mr. *Spencer*, the endorser. No jury, on the evidence here given, would have hesitated to have found a verdict against him.   If there is evidence, *prima facie*, to charge the endorser, the defendants are not liable. It is not stated that the endorser had any dwelling house at *C.*: but merely that he had a law office there, and was, in fact, in *Washington*.   It is incumbent on the plaintiffs to show that the notice at the office was insufficient, because the endorser had a dwelling house in *C*.   The defendants had no notice of the suit brought by the plaintiffs against Mr. *Spencer*, and are not to be concluded by the judgment

in that suit. Had the defendants been called in to aid the plaintiffs in that suit, they might have furnished sufficient evidence to have charged the endorser.

4. But regular notice was given to the plaintiffs. No rule is better settled, that it is only necessary to give notice to the holder from whom the note was received, and it is his duty to give notice to the antecedent parties to whom he intends to resort. (*Chitty on Bills,* 166, 167. (180, 181.) 2 *Johns. Cases,* 1. 3 *Johns. Cases,* 89. 6 *East,* 14. note. 2 *Taunt. Rep.* 224.) This Court have decided, that a notary is not bound to give notice to all the endorsers. (*Morgan v. Van Ingen,* 2 *Johns. Rep.* 204.) The notary, then, in this case, having done all that was required of him by the law-merchant, on what pretence are the defendants to be made liable, assuming even that he was their agent? Nothing more could have been required of the defendants themselves, than to give notice to the holders or owners of the note, there being no particular instructions on the subject.

5. The notary is an independent sworn public officer, acting under the authority of the state, and was as much the agent of the plaintiffs as of the defendants. Notaries are recognised by the statute, and have fees established by law. (Sess. 38. ch. 262.) It is the notary, then, who is liable, if there has been any neglect of duty. If the defendants had been directed to have the note put in suit, and had delivered it to an attorney of this Court, for that purpose, they could not be made responsible for his neglect. A postmaster is not liable for the acts of his assistants; (7 *Cranch,* 269. *Cowp.* 765. 1 *Johns. Rep.* 396.) they being sworn officers.

6. The record of the judgment in the suit of the plaintiffs against *S.,* the endorser, can avail nothing, for *non constat,* but that the judgment was given for some other reason than a want of notice; and if it was offered to enhance the verdict, by including the costs of that suit, it was improper.

WOODWORTH, J. delivered the opinion of the Court.

*Henry B. Gibson* testified, that the uniform custom is, for the bank to cause notice to be given to all the endorsers;

ALBANY,
January,1823.

SMEDES
v.
UTICA BANK.

he considered this as *the established custom and general understanding*; and that the bank appoint their own notary, with whom the customers have nothing to do.

The plaintiffs offered to produce other witnesses, conversant in banking business, to the same effect; but it was deemed unnecessary by the Judge.

*Seymour*, cashier of the *Utica* branch, testified, that this note, not being paid, was handed to *Mower*, agent of *Childs*, the notary usually employed by the bank, to protest, and give notice of non-payment; that the bank has nothing to do with the notary; he considered the duty discharged when the note is delivered to him for protest; that it was no part of its business to transmit notice of non-payment. This testimony may seem, at first view, to be at variance with the evidence of *Gibson*; but, when attentively considered, it is not opposed to it. *Seymour* does not speak of the established custom and general understanding between banks and their customers, but gives his opinion as to the legal liabilities of the *Utica* branch. He proves nothing in relation to the general usage of banks, nor the nature and extent of the understanding, on lodging notes for collection. He does not state any act done, by which the public might learn, that the *Utica* branch claimed an exemption from the operations of an established custom and general understanding, if any such exist. *Gibson's* testimony is not matter of opinion, as to the duties of banks; he stated, as a fact, that the uniform custom is, to give notice to all the endorsers, and so is the general understanding: he goes on to give his opinion, that a bank which should neglect it, would be liable; but, of this part, I take no notice.

Without examining the point, how far the Court will take judicial notice of the general usage and custom in this respect, of which I have never heard a doubt expressed, before the argument of this cause, I think the evidence before us, fully proves the general custom and understanding to be, as contended for by the plaintiffs' counsel; and, if so, the plaintiffs, placing a reliance on this known and general rule, are entitled to the benefit of it, as against the defendants, until it be shown, that they did not acquiesce in the usage, and gave publicity to their dissent. The practice adopted

ALBANY,
January, 1823.

SMEDES
v.
UTICA BANK.

at the *Utica* branch, also proves, that they give notice when a note is lodged for collection.    *Seymour* admits, that the note was handed to the agent of the person usually employed to give notice; whether he is correct, in supposing, that the duty of the bank was discharged, after this was done, is a distinct question, and will be subsequently examined.   My conclusion, on this part of the case, is, that from the acts of the parties, and the established usage of banks, the defendants must be considered as undertaking, in default of payment by the makers, to give notice to the endorsers.

The next question is, whether a sufficient consideration is alleged to support the action ?    There is a well settled distinction between actions *for nonfeasance and for misfeasance.* When one party intrusts the performance of a business to another, who, without consideration, undertakes, but wholly omits to do it, no action lies, notwithstanding the plaintiff may have sustained special damages ; but if the party enters upon the execution of the business, and does it amiss, through the want of due care, by which damage ensues to the other party, an action will lie for the misfeasance.   In the case of *Thorn* v. *Deas,* (4 *Johns. Rep.* 96.) this question was ably discussed, and all the authorities examined ; and the result of the investigation sanctions this distinction.    In *Elsee* v. *Gatwood,* (5 *Term Rep.* 143.) the law is laid down in the same manner.   If the plaintiffs had declared for misfeasance, the question of consideration would not arise ; yet the action in that form would be equally well calculated to afford redress.   I think this proposition warranted, inasmuch as the defendants did, in fact, enter upon the execution of the business, by delivering the note to *Mower,* for the purpose of giving notice.   But there is no count in the declaration adapted to the proof respecting a misfeasance.    The third count is the only one on which the plaintiffs can rely ; and that is for a nonfeasance, which cannot be supported, unless founded on a valid consideration.   I have already stated my views of the nature and extent of the contract in this cause.   The promise of the defendants is founded on the delivery of the note by the plaintiffs.

ALBANY.
January,1823.

SMEDES
v.
UTICA BANK.

An injury to one party, or a benefit to another, is a suffi-cient consideration for a promise. (*Miller* v. *Drake*, 1 *Caines*, 45. *Foster* v. *Fuller*, 6 *Mass. Rep*. 58.) It will be conceded, that had this been an undertaking by an individual, to de-mand payment and give notice, it would be a *nudum pac-tum*, unless something more appeared than is disclosed in this case; for no benefit could result to the promisor in per-forming the service, and paying the money over immediately after he received it; but the case of banking institutions is widely different; they are established to aid the commerce of the country, by giving facilities to the monied operations of the community, and on the strength of credit, to enlarge the amount of actual capital. They have a powerful influ-ence in enforcing punctuality in payments, and thereby pro-ducing a state of confidence essential to commerce and use-ful to all classes. The operations of a bank principally con-sist in loaning money and discounting notes, which are di-rect and immediate sources of profit. Incident to the busi-ness of a bank, is the receiving of notes from their customers for collection; when paid, the money is placed to the cre-dit of the depositor, and remains in bank until called for. Where business of this kind is done extensively, it is evident that more or less of the money collected may be calculated on with safety to remain in the vaults of the bank. In some in-stances, the money may be immediately withdrawn; in others, it will remain a considerable time; the amount being subject to be increased or diminished, from week to week, and varying according to the sums collected and withdrawn by the deposi-tors, it is possible that at some particular time, a bank may not have a cent of the money collected; but from the course of business, and the occasions for using money, being so diver-sified among different individuals, and the certainty that money will be permitted to remain in a place of such safety, until really wanted, there is no reasonable doubt, that large sums frequently, and to some amount, at all times, may with entire prudence be calculated on. The amount of notes dis-counted will depend not only on the actual capital paid, but on various other considerations not necessary to be con-sidered. As one important item, the deposits may be men-tioned :—If a bank has been in successful operation, for a

number of years, and the deposits have never been less than a certain amount, though often greatly exceeding it; if the prospect of future business affords no ground to expect a diminution, then the deposits will be considered, by the most prudent board of directors, as authorizing an increased discount, beyond what the capital alone would justify. Notes being discounted for short periods, at the expiration of which payments may be demanded, the bank is thereby enabled to regulate its operations, so as not to incur risk in the event of sudden fluctuations, whereby the deposits may be wholly withdrawn or greatly diminished. No evidence was necessary on the trial to show such a practice; it is sufficient that it is incident to a bank, and may be a benefit, which I apprehend will not be questioned  The custom of receiving notes for collection is not founded on mere courtesy, but with a view to the interests of the institution, and is the source from whence profit may and does arise. It is no answer to this view of the subject to say, that banks have no fees or pecuniary advantages from the notes lodged for collection, by which is meant, I presume, specific compensation. *Seymour* states this in his testimony; and although undoubtedly true, it does not operate against the argument I have advanced : neither is it to the purpose, that in the opinion of the defendants' cashier, notes received from the *Ontario Bank* were rather a burden than an advantage, because the money, if paid, would be immediately withdrawn. In the particular instance before us, such opinion must be founded on what had been the practice previously; but as to the future, it is merely conjecture. For aught that appears, this money might have lain for months before it was demanded; be that, however, as it may, it is enough for the plaintiffs to establish, that the deposit of money in a bank, as a general proposition, is beneficial. This, I apprehend, has been done, and consequently the delivery of the plaintiffs' note for collection, when nothing appears that either party knew or expected that the money would not be paid, must be considered as an act not imposing a burthen, but as conferring a benefit, from which profit, however small, might probably arise. This act, then, was a good consideration for the defendants' promise, and removes the objection taken on that ground. It

ALBANY,
January, 1823.

SMEDES
v.
UTICA BANK.

is not necessary to show, that profits would inevitably accrue to the bank; it is enough that a reasonable expectation exists that such will be the result. In the case of *The Union Turnpike Company* v. *Jenkins*, (1 *Caines*, 389.) it was held, that the expected profits to accrue from the stock, for which *Jenkins* had subscribed, was a sufficient consideration to uphold the promise. The judgment of reversal turned on other grounds, and left that point untouched, as was adjudged by this Court, in 9 *Johns. Rep.* 217.

The next question is, has legal notice been given to the endorser? The law has so well settled what shall constitute legal notice, as to be familiar to persons usually employed to protest bills and notes. When the party resides in the same city or town where the demand is made, notice must be personal, or left at the dwelling house. (*Ireland* v. *Kip*, 10 *Johns. Rep.* 490.) If the endorser resides in a different place, notice must be forwarded on the day of demand, or the day after, and by the next mail, directed to the endorser, and advising him of the protest. In case of a temporary removal of an endorser, from the place where payment is to be made, notice left at his last place of residence there, will be sufficient. (*Stewart* v. *Eden*, 2 *Caines*, 121.) Demand and notice, in every case, are a condition precedent to the holder's right to recover. (*Berry* v. *Johnson*, 9 *Johns. Rep.* 121.) And in every case, the endorser is entitled to strict notice. (*French* v. *The Bank of Columbia*, 4 *Cranch*, 164.)

If the defendants have complied with these requisitions, then, without reference to the termination of the suit against the endorser, they are exonerated, for they were not parties to that suit, nor are they concluded by it.

*Mower* testifies, that on the day the note fell due, he delivered notice *at the post office, or at the law office of Spencer, the endorser*, but could not tell which; that in the afternoon of the day the note was protested, and previous thereto, he inquired of *Wilson, Spencer's* partner, if certain funds were applicable to the payment of the note, who answered, he had no instructions. The witness further testified, that he had no recollection of ever leaving at the post office a notice of protest, addressed to an inhabitant of the

village, and believed the notice was left at *Spencer's* office, but cannot say, positively, that it was not at the post office. From this evidence, the presumption is rather stronger, that notice was left at the endorser's office, than at the post office; still, however, the fact is doubtful. The notice at one place would be sufficient; at the other, a nullity. The question is not, what inference the jury might draw, but what testimony does the law require in this case. We have seen, that this is a condition precedent, and that strict proof is required. The law has allowed the endorser this protection; nothing short of clear proof of notice shall subject him to liability.

ALBANY,
January, 1823.

SMEDES
v.
UTICA BANK.

The reason and justice of requiring clear proof against a surety, will not be doubted. It is imposing no hardship on a party, to require the proof supposed to be in his power; it is in coincidence with the general principles of law, in respect to sureties. A relaxation of this rule, would make the liability of sureties depend on the various and different opinions, which different juries would form on the same state of facts: a doctrine so mischievous, ought not to be tolerated. If the witness had understood his duty, he would have known, that notice at the post office was unavailing; and, as there cannot be a doubt but that he intended to serve the notice legally, there would seem to be no difficulty in speaking positively, that it had not been left at the post office, if that was the fact. On reviewing this evidence, there can be no surprise, that the plaintiffs failed to recover against the endorser. I think it equally clear, that, in this respect, the defendants have failed in making out their defence.

I have already stated, in general terms, that the defendants were bound to give notice to the endorser; and as effectual or sufficient notice has not been given, it becomes necessary to examine, more particularly, whether the defendants have, in legal contemplation, shown a compliance with the duty which had thus devolved on them. The holder of a note, who requires the service of notice upon the endorser, if he wishes to possess evidence of the fact, must, of necessity, substitute another person to perform the service. In the case of a corporate body, it can be performed in no other way than by substitution. Does the en-

gagement of a bank to give notice, guaranty absolutely, that legal service shall be made ; or is the understanding satisfied, if the bank selects an agent to do the business, of known fidelity, and in every respect competent to discharge the duty ? In order to decide the extent of the defendants' undertaking, the nature of the business to be performed, and the manner it is generally executed, must be considered. The plaintiffs must be presumed to know the course of practice to charge an endorser. Banks employ some suitable person to make protest of notes, and to give notice. The plaintiffs would have done the same had they retained the note. It would, therefore, be manifestly against the understanding of the parties, as well as unjust, to construe the contract otherwise than according to the known and uniform course of proceeding in such cases ; that would be extending the liability, in case of default, arising from whatever cause, instead of placing it on the ground of negligence, upon which it ought to rest. The defendants, then, had not, as *Seymour* supposes, discharged the duty, merely by handing the note to a person for protest ; but they must meet the inquiry as to the competency and fidelity of the agent selected ; and if, in this respect, there is no cause for complaint, they have done all that was required ; their defence is complete. The controversy being, then, narrowed to this single point, the question is, have they shown, affirmatively, what I conceive they were required to do, that *Mower* was, in every respect, qualified to perform the duty according to the principles I have laid down ? If the note had been delivered to a notary, it would present a different case. Notaries are officers appointed by the state ; confidence is placed in them by the government. This may be evidence sufficient to justify an agent in committing to them business relating to their offices, although, in point of fact, it might subsequently appear, they did not possess the necessary qualifications. But there was no notary in the village of *C.*, and as no protest of a promissory note, or inland bill of exchange, is necessary, nor is it evidence of the facts stated in it, the note might, equally well, be placed in other hands. (6 *Wheat. Rep.* 140. 572.) All the evidence given by the defendants is, that *Mower* was a clerk in the bank, and agent of *Childs*,

the notary usually employed by the bank to protest, and give notice of non-payment. He received notes from the bank, and delivered them to *Childs*. If the latter sent him to serve notices, they were undoubtedly accompanied with instructions, so that the general competency of *Mower*, when no instructions were given, is left undecided. There is no proof to show that a proper agent was selected; in addition to this, I think there is affirmative evidence of *Mower's* want of skill, and necessary knowledge, derived from the manner he performed the service. If the steps necessary to charge an endorser had been familiar to him, his mind would not have been in doubt, whether he left the notice at the post office, or at the endorser's office. He would know, that in the former case, the notice was a nullity. We cannot suppose he would do a nugatory act knowingly; if he was doubtful whether such notice was not effectual, the course he pursued will cease to excite surprise. Owing to this cause, I apprehend, he did not testify in so decided and unequivocal a manner, as would render the endorser liable. *Mower* also testified, that in the afternoon of the day on which the protest was made, and after it was actually made, as *Jamieson* states, he called on *Wilson*, at the endorser's office; *Mower* then had a notice of protest, and *Jamieson* saw it; yet, instead of serving it, he contented himself with inquiring whether certain funds were applicable to the note, and being answered by *Wilson*, that he had no instructions, he leaves the question of actual service in uncertainty. I cannot persuade myself, from an attentive consideration of these facts, that the agent employed by the bank was well qualified to execute the business committed to his care. I do not hold him responsible for want of memory; but judging from his acts, he seems not to have possessed accurate knowledge of the business he had undertaken.

In either point of view, this presents a case of negligence, for which the defendants are responsible; and on this ground the plaintiffs are entitled to judgment.

Judgment for the plaintiffs.