I shall, in the first instance, examine the primary and fundamental question, viz., what power or capacity this bank possessed of incurring obligations, and whether it extended to the borrowing of money. This question is antecedent to and independent of the further *Page 165 
one, as to the nature and form of the written evidences with which it could furnish its creditors.
It is admitted the legislature had the constitutional power to create banks, with such faculties as they chose, in respect to the business they were to transact, the obligations they could assume, and the evidences they could furnish of such obligations. The question is, therefore, not one of power but of intention. The act itself is the only legitimate source of the bank's powers, and to its language the court must be confined in the work of construction. But in legal enactments, as in all human composition, words are often used symbolically, or with a secondary meaning. Hence, frequent ambiguity, and hence the necessity of exegesis and construction. In determining the powers of this bank, while we must confine ourselves to the language of the act, yet we may look to all other sources of information to evolve the true meaning of that language.
The fifteenth section of the act authorizes persons toassociate, and establish offices of discount, deposit andcirculation, on the terms prescribed. The eighteenth section confers the power on such associations to "carry on the business of banking, by discounting bills, notes and other evidences of debt, by receiving deposits, by buying and selling gold and silver bullion, foreign coins and bills of exchange, in the manner specified in their articles of association, for the purposes authorized by this act, by loaning money on real and personal security, and by exercising such incidental powers as shall be necessary to carry on such business." It will be seen this language confers the same powers as were possessed by the old banks, by virtue of their charters (Laws of 1831, ch. 178, and other acts), and was probably intended to put them upon an equality in regard to their powers; although the old bank charters contained restrictions peculiar to them, and not found in this general act. The receiver's counsel contend that the powers enumerated in the eighteenth section exclude all *Page 166 
others, except the necessary incidental powers to consummate those enumerated, and, as the power to borrow money is not enumerated, it must be excluded. But this mode of testing the power of banks is quite too summary and dogmatical. It assumes, first, that the capacity or faculty of borrowing money is apower; secondly, that it is not a power necessary andincidental to any one of the enumerated powers: and thirdly, that the capacity to borrow cannot be evolved from any of the enumerated powers.
The power to receive deposits is given specifically, and without limitation. But what are deposits, and what, in commercial law, are the obligations which are, or may be, assumed by the parties to that species of contract? Originally, a deposit of money was made by placing a sum of money in gold or silver with a bank or other depository, to be returned, when called for, in the same identical coin, and without interest, the depositor paying the depository a compensation for his care. But, for more than a century prior to the passage of the act in question, the term "deposit" had come to mean quite a different transaction, as to the rights and liabilities of the parties to it. It became customary to deposit money for a particular period, and on interest, or payable at certain prescribed periods after notice. In short, the term deposit became a symbolical word to designate not only a deposit, in its original sense, but all that class of contracts where money in any of its forms, as specie or bank bills, was placed in the hands of banks or bankers, to be returned in other money, on call or at a specified period, and with or without interest. The transaction it designated, in this figurative use of the term, was in reality the same as that called a loan of money, when it occurred between individuals. In this last and widest acception of the term deposit, it was most probably used by the legislature of 1838; for it was well know in all commercial communities, at that period, and to all competent legislators, that borrowing money to lend again is a part of *Page 167 
the legitimate business of banking. A banker is a dealer in capital, an intermediate party between the borrower and lender. He borrows of one party and lends to another, and the difference between the terms at which he borrows and lends is the source and measure of his profits. (Gilbert's Pr. Obs. on Banking, 25; 1McCulloch's Com. Dic., 86-117.)
I am unable to perceive any reasons of policy to deny to the banks the privilege of incurring obligation by way of loan while they can incur the like obligation by taking in deposits. In truth, the obligations we have seen are the same, except in name. The act does not define the meaning of the term deposit, nor does it in any way restrict its meaning. Hence we are at liberty to assume it to have been used in that sense in which it was used and understood amongst banks and bankers. These considerations tend to the conclusion that the legislature intended to include the power or privilege of borrowing money in the power to receive deposits, that it meant the same thing, in commercial language.
That the power to borrow money is a legitimate inference from the power to take in deposits, and is indeed a unit with that power, is proved by the decision made in reference to other clauses of this act, and other similar charters. In Safford v.Wyckoff (4 Hill, 422), the question arose whether a bank organized under this act could bind itself by a bill of exchange not countersigned and registered by the comptroller. The Court of Errors held that it could, and that the power to sell bills of exchange included the power to draw bills of exchange; and that as the drawing such bills was a usual, ordinary business of banking, it could not be presumed the legislature intended to prohibit it. There is another class of obligations into which these banks can enter, and which, though not expressed, are yet inferred as incidental to the power of receiving deposits. It is that of assuming to charge endorsers of the notes of its customers left with the bank for collection. This obligation springs *Page 168 
out of the custom of bankers receiving such notes to collect, on the express or implied agreement that the money, when paid in or collected, will remain on deposit, for some short time at least, for the benefit of the bank. If the bank neglects to use due diligence, to charge endorsers on commercial paper thus left with it, it is subjected to the loss. This responsibility of banks has been enforced in this state in numerous instances. (20 John.,
372; 3 Cow., 662; 11 Wend., 473; 22 id., 215; 6 Hill,
648.) In all these cases, the consideration of the bank's promises to charge the endorser is based on the benefit of the expected deposit. It is evident, therefore, that the terms of the deposit, the consideration to be paid therefor, and all its concomitants, areleft to the contract of the parties, or to the general usages of the commercial world. Why, therefore, does not the word embrace the case of a loan of money for any agreed period of time, to be repaid with interest? In the absence of statutory definition of the term deposit, it should be held to be synonymous with and include a loan, when used in respect to a transaction in which a bank becomes the debtor by borrowing money.
In addition to the express powers enumerated, the act confers all necessary incidental powers to carry on the business authorized, viz., the business of banking in the three departments of issue, deposit and discount. The word necessary, as here used, does not mean physical, or logical, or moral necessity; because, if it did, then the opinion of the chancellor, in the case of Safford v. Wyckoff, and every other member of that court whose opinions are reported, cannot be sustained. They all concurred in holding that the bank could incur indebtedness for rent, clerk hire, c. But if the word necessity is to be construed in logical strictness, it is impossible to hold that these banks can incur any sort or degree of indebtedness, for the reason that they can always pay down or in advance. The term is used to mean that kind of necessity which custom and usage impose on *Page 169 
that particular branch of business called banking. These customs vary with times and localities, and hence these incidental powers could not be enumerated, but are left to time and circumstances. This construction of the term is strengthened by the word incidental, in corelation with which it is used. It means casual or accidental, beside the main design, occasionally. Taken together, they may, and probably must, mean to authorize those occasional acts of power which are necessitated by the mutual wants of the banks and their customers, but which may not fall within the strict letter of the enumerated powers, such as drawing bills of exchange, as in the case of Safford v.Wyckoff, or receiving notes to collect and charge endorsers, in expectation of the use of the money, as in the cases above cited, or to make a loan of money to redeem its circulation or pay debts, or to endorse bills of exchange on the sale, or to obtain the rediscount of commercial paper, and numerous other occasional transactions rendered necessary by the exigencies of business, but which are incidental to the regular business of banking.
Although the power to borrow money may be justly predicated on the express power to receive deposits, on principles of construction above indicated, or may be found amongst the mass of unenumerated, incidental and necessary ones, I prefer to put my opinion upon the broad ground that every corporation, unless prohibited by law, can incur obligations, as a borrower of money, to carry on the legitimate business for which it was incorporated, although not specially authorized to borrow by its charter. Such has been the uniform language of the courts in this country. I refer to the following authorities, which cover the question, and affirm the power in so many forms and aspects, that it ought no longer to be doubted. 12 S. R., 256; 16Mass., 94; 7 Wend., 31; 6 Humph., 515; 1 Sandf. Ch. R.,
283; 1 Seld., 547; 2 id., 412; 3 W. Minot, 105; *Page 170 
1 Smedes M. Ch. R., 207; 4 Hill, 442; 1 Cow., 513; 3Wend., 94.
The capacity or liability to incur obligations in conducting the legitimate business of banking is not a power, in any just sense. The term is used in a sense synonymous with franchise, and the borrowing money is not a franchise. A franchise is a special privilege conferred by government on individuals, and which does not belong to the citizens of a country generally, by common right. (Bank of Augusta v. Earle, 13 Peters, 519.) The right to issue a circulating medium, to hold property in a corporate capacity, and to perform the general functions of a banking institution, are powers, or franchises; but the mode by which the money shall be obtained for carrying on the operation, whether by the sale of property, or by borrowing, or donation, cannot be a franchise. As well may it be said that the privilege of keeping their money in an iron safe is a franchise or power.
Nor is there reason for the opinion advanced by some, that the legislature of 1838 intended to withhold from the banks the capacity to incur debts; but much to show the contrary intent. Prior to that time, the holders of bank bills and other creditors stood on an equality, the former having no better security than the latter, in case of the bank's insolvency. Hence, the necessity of the prohibitions contained in the twenty-seventh and thirty-fifth sections of the act of 1829, called the safety fund act; the first named section limiting the amount of the bank's circulation, and the latter forbidding the issue of time paper. Both served to limit the total amount of indebtedness of banks, and contributed to the security of all classes of creditors. Hence, too, the absence of these provisions in the act of 1838. They were unnecessary, because the circulating notes of this class of banks were secured by the pledge of stocks and mortgages, deposited with the comptroller. The other creditors were left to rely on the general solvency of the banks to which they had trusted. *Page 171 
The legislature had discharged their trust, when they had protected the citizens against a depreciated currency.
The North American Trust and Banking Company had, at the time of this loan, millions of assets, in bonds and mortgages, but little or no cash capital. It became necessary to turn these assets into cash in some mode, or cease business. That it could have sold every dollar of these assets is not denied. It chose to hypothecate them instead. It may have been unwise, in a business point of view. But here the question is not one of prudence, but of power or capacity. I have no doubt it had full power to borrow money in the manner it did, both as a necessary incidental power to carry out the enumerated powers specifically granted, and also as a capacity inherent in every corporation, unless expressly forbidden.
Assuming it as an established proposition, that banks organized under the law of 1838 may incur obligations, in conducting the business of banking, the next question in order is, whether any prohibition existed, prior to the law of 1840, to their executing and delivering written evidences of such obligation. It has been decided by this court, that banks organized under this law are moneyed corporations, and therefore within the provisions of title 2, of ch. 18, of part 1, of the Revised Statutes; and to this decision we ought to adhere, whatever might be our views, were it res nova. Conceding this to be so, still I find no express provision against this class of banks executing any evidence of indebtedness they saw fit, either in the eighteenth chapter aforesaid, or in the act of 1838. In the absence of prohibition, there can be no doubt they had the right. The safety fund law of 1829 did not apply to these banks, but to such institutions only as were organized between 1829 and 1838, and to those the charters of which were amended and made subject to the provisions of that act. It is true, the first section of the safety fund act declares "every moneyed corporation, having banking powers, hereafter to be created *Page 172 
in this state, * * * shall be subject to the provisions of this act." This is comprehensive phraseology, and would include these banks of 1838, were it not for the implied exemption of this class of banks, which is inferable from the total incompatibility of the provisions of the two acts. There was no law prior to 1840, expressly forbidding this class of banks issuing obligations of any character they chose.
As most of the obligations referred to in the trust deeds were issued before the act of 1840 took effect, that portion of them which fell into the hands of purchasers for a valuable consideration, and without notice, must be held valid securities. If any of them were issued after the act took effect, they are ineffectual as securities. It has been vehemently urged, by counsel for the appellant, that it is contrary to the policy of this state to allow banks to issue time paper. I know of no general or settled policy on the subject, nor of any source from whence it can be learned, other than the statute laws of the state. It is true that in 1829 the banks, subject to the safety fund law, were prohibited from issuing bills and notes payable in future. But this act was not general, and did not extend to the large number of banks then in existence, nor to those under the act of 1838. I have already suggested the reasons why limitations were imposed on the banks, under the safety fund system, and that those reasons do not apply to the new banking system of 1838. Not until May 14th, 1840, was the prohibition against issuing notes and bills on time extended to banking associations by name; and at the same period many other provisions, peculiar to the safety fund system, were extended to them, which clearly did not previously affect them. The legislature, by thus classing the prohibition of time paper with other provisions, which confessedly did not previously apply to the banks of 1838, seem to admit that, before that time, it was lawful to give time paper. If it had been the intention or policy of the *Page 173 
legislature of 1838 to forbid the issue of such paper, the law should have said so plainly, and not have left the prohibition to rest on doubtful inferences. I am of opinion these banks had the right to issue such obligations as these so-called bonds, or any other obligations they and their customers agreed on, for any indebtedness they were enabled to contract. The following authorities support this proposition: (15 John., 44; 1 Cow.,
531; 3 Wend., 94; 12 John., 227; 2 Hill, 267; 1 Mer.,
541; 3 Bing., 589; 13 Peters, 519.)
The appellant contends that if the obligations called bonds are valid in other respects, they are void for usury, whether regarded as English or New-York contracts. As these bonds were payable in England, and sold there, or the loan obtained there, it is clear that they must be considered as English contracts, and the question of usury be determined by the English law.
The respondents seek to avoid the defence of usury by three answers: First. That by the laws of England the contract is not usurious; Second. That the receiver cannot seek relief and discovery without offering to pay what is justly due, as he is not the borrower; and Third. That by the act of 1850 corporations are disabled from interposing the defence of usury. As the last answer is a valid answer to the defences, I shall pass the other two without remark, except that I am of opinion, the receiver representing the corporation for all legal purposes, that he is a borrower within the true meaning of the act of 1837, and is the corporation within the true meaning of the prohibition in the act of 1850. It was competent to the legislature to make this law. It did not impair the obligation of this contract, but affected the remedy only, by depriving the borrower of a defence in the nature of a penalty or forfeiture.
In 1837, the legislature altered the remedy in favor of this defence of usury, by allowing borrowers to file bills *Page 174 
for discovery and relief, without tendering the amount justly owing; and this law was applied to contracts already made.
That the act applies to contracts already made, is apparent from the explicit language used. "To interpose the defence," means not only to plead it and give evidence thereof, but also to use it at the trial as a defence. The inhibition extends to the entire series of acts which constitute the defence, and to each of them. All will admit that the language of the act will include the case of such a defence, where the plea was not interposed when the act passed. But it would be unreasonable to make a distinction between such a case and one where the plea is already put in but not tried. Hence, we should hold the act to include all cases where the defence was yet to be made complete.
The next questions arise on the validity of the instruments called trust deeds. Whatever may be the most appropriate name for those instruments, I am of opinion they were such assignments, or sales of the effects of the corporation, as fall within the scope of the eighth section of the act, entitled "Of moneyed corporations" (1 R.S., 589). I am also of opinion that no such resolution, as the said section requires, was passed by the board of directors previous to such assignment. I am also of opinion that a resolution, passed subsequently, will not render valid a previous assignment, made without the requisite authority. The language of the section is positive, and admits of no other construction. The validity of the trust must depend, so far as this section operates upon it, on the fact whether the holders of the bonds were purchasers in good faith, without notice that the assignment was made without a previous resolution. The purchasers of those bonds, and those who advanced money upon them as pledges, are purchasers of the securities assigned by the trust deed. They obtained an interest in them the moment they advanced money upon the faith thereof; and if the trust deeds come *Page 175 
within the meaning of the eighth section, for any purpose, the holders of those bonds, for a valuable consideration, are confessedly purchasers. The last clause of the section embraces immediate as well as remote purchasers, but the trustees were neither. They were mere trustees, without any interest in the trust, and, so far as they were parties to it, the trust was inoperative, as against the company and creditors. One of them was a director, and, so far as he is concerned, it must be assumed that the assignment was taken with notice that no previous resolution of the board of directors authorized it. But notice to trustees of a want of that resolution was not notice to the subsequent purchasers of the bonds, because the trustees were not the agents of the bondholders, or if they could be so held, yet notice to Graham existed prior to this creation of the agency, and did not come to him in the course of his agency as trustee. But if the trustees can be adjudged purchasers, and chargeable with notice, then the bondholders must of course be held subsequent purchasers, without notice expressed or implied.
It is further claimed by the receiver that the trust deeds are void, because made while the company was insolvent or in contemplation of insolvency, with intent to give a preference to particular creditors over other creditors, contrary to the ninth section of the act above cited. The bonds were made to secure a loan of money to the company, to be used in the payment of the debts of the latter. It is not proved that the money to be obtained was intended to be paid to any particular creditor, or that any preference was in the contemplation of the directors. The case is not within the ninth section of the statute, for the reason that the assignment was made, not to secure existing creditors, but to secure a new class of creditors, to be thereafter created on the faith of these very assignments. The object of the section was to prevent preferences amongst existing creditors, when the company was insolvent. It did not *Page 176 
intend to prohibit offering security to a new class of creditors, who loan money to a corporation to enable them to pay debts. It is true that the money thus obtained might be used to give preferences amongst existing creditors, by paying one or more, to the exclusion of others; but, if so, the money thus paid illegally may be recovered back by the receiver, within the explicit language of the act. The illegal act of the directors, in using the money to give preferences, cannot, however, retroact on the previous valid assignment to secure the loan. I, therefore, hold that said assignments are not impeached, as contrary to the ninth section of said act.
The trust deeds are also claimed to be void upon their face, as against creditors, because made in trust for the use of the company. In support of this position, the counsel rely on 2R.S., 135, § 1, and some decisions of this court. (Barney v.Griffin, 2 Comst., 365; Leitch v. Hollister, 4 id.,
211; Goodrich v. Downs, 6 Hill, 438.) From a careful examination of the above section, and its origin, I am satisfied that it is to be confined to cases of trusts created for the sole benefit of the grantor of the property in trust, and is not applicable to a case like this, where the sole object of the trust is to secure third persons for a loan of money, although some trust may happen to be expressed in the deed, incidentally beneficial to the grantor.
In the case of Goodrich v. Downs, the opinion of the court alludes to the first section of this statute, and seems to rely upon it, as in point, to prove that the question of intent need not be submitted to the jury. In that respect the court probably erred, in that case, as the section cited had no bearing on the point in judgment. The question in Barney v. Griffin was on an assignment of real estate, and the said first section relates only to personal property.
I am of opinion that, in all cases of conveyances, c., where third persons are made beneficiaries, the case falls under 2R.S., 137, §§ 1, 4 and 5, and the question of *Page 177 
fraud is one of fact, depending upon intention. It being a question of fact, I have examined the evidence to discover the intent with which the trust deeds were executed, and have arrived at the satisfactory conclusion that the trust deeds were executed to secure a loan of money for the use of the company; and without intent to hinder, delay or defraud creditors. In coming to this conclusion, I am much influenced by the fact that the assignment comprised not to exceed one-half of the assets of the company; and there is no proof to show that the residue, together with the money to be loaned on the assigned securities, would not have paid all the existing debts of the company.
Having determined that the company had capacity to borrow money; that it was not prohibited from issuing written evidence of its promises, in any form it chose to contract, prior to the act of May 14, 1840; that the million and first half million trust deeds are valid in behalf of the purchasers of the bonds they were intended to secure; it still remains to determine who, amongst the holders of those bonds, come within the saving clause of the eighth section of the act. Clearly, none but "purchasers for a valuable consideration and without notice" can claim to have a good title within that section. Those bonds which were sold in London, out and out, passed to the vendees a good title or claim to the fund created by the trust, or so much thereof as will satisfy them. There is not any evidence that those several purchasers had notice of any defect in the title, and they paid valuable considerations for the said bonds.
I am also of opinion that the bonds pledged to the Messrs. Palmers, in February, 1840, for advances then and thereafter made, and in consideration of the state stocks surrendered up by them, on the faith of such pledges, place them in the position of purchasers for value, within the meaning of the said section and of the law merchant. These bonds were pledged to cover the general balance of accounts, as *Page 178 
I understand the evidence. But the judgment appealed from should be modified in two respects as to the claims of Messrs. Palmers. They should be allowed English interest on their demands, inasmuch as it is an English contract and not a New-York contract. The amount of their commission for the sale of the bonds to themselves should also be deducted. The relation of agent and purchaser of and from the same principal is incompatible and should not be countenanced.
The claims of the Messrs. Holford stand on different facts. It is charged in the cross bill, and is admitted in the answer of the trustees and of the Palmers, that twenty-four of those bonds were delivered to James Holford Co., as collateral security for a preëxisting indebtedness of the company, and that nothing was advanced at the time as a new consideration for said bonds; and none is alleged in the said answers. Holford Co. have suffered the bill to be taken as confessed; but the trustees and their counsel claim to represent their interests. Admitting this to be so, I incline to the opinion that they cannot sustain the Messrs. Holford's claim to hold those bonds for any purpose. The Messrs. Holford are not purchasers for valuable consideration, using that term in the commercial sense; and, as applied to bills of exchange and promissory notes, the taking of the bonds, as collateral security for an antecedent debt, is not paying value within the rule, either in England or in this state. The farthest any court in this state, or the supreme court of the United States, has gone, is to hold him a purchaser for a valuable consideration, who takes a note in payment of a precedent debt. (16 Peters' U.S.R., 1; 2 Kern., 551.) If the proof in this case would have sustained an answer, alleging that the time of credit was extended, in consequence of the deposit of those bonds, and that such fact in law would furnish the requisite valuable consideration, yet, the fatal answer is that no such fact was put in issue, and cannot be available as proof. It must be *Page 179 
recollected that this is a contest between the stockholders and creditors, on one side, and other creditors who claim a preference by means of the trust deeds, on the other. The legal title has not passed out of the company, for want of the previous resolution authorizing the transfer; and it is only as purchasers in good faith, for value, that the Messrs. Holford can have a standing in court. Admitting the question of good faith is to be determined by the English decisions, none go far enough to protect this transaction. The case of Percival v. Frampton (2Cromp. Mees. Ros., 180), is cited to sustain the position, that taking a note as security for a precedent debt is taking it for value. But in that case, the plaintiffs were bankers, and they discounted the note in payment in part of a precedent debt, and paid the balance in cash, and the decision is really put on that ground.
The United States Bank of Pennsylvania and the Girard Bank, loaned to the company $250,000 in July, 1840.
[The learned judge here stated the facts in relation to the making of the loan, and issuing of the certificates of deposit, and proceeded.]
These certificates of deposit are essentially bills or notes, and are void promises, because issued after the act of May 14, 1840, took effect. They fall within the description of paper condemned in Leavitt v. Palmer (3 Comst., 19); and the mortgage bonds having been taken as collateral security for the performance of those void promises, cannot be enforced. Those bonds are not bills or notes, within the act of 1840, nor are they specialties, for want of a common law seal; but I hold them to be special agreements not under seal. They are not bills or notes, because they are not negotiable, although they are assignable. Prior to the Code, they would have been suable in the name of the payee only. They are, in this respect, like the case of the India bonds, reported in 13 East, 510. They contain a power, in addition to a promise to pay a specific sum of *Page 180 
money, viz., the holder has the option to turn the bond into the stock of the company. The general form of the instrument, also, is so variant from that of bills and notes, that I am clearly of opinion it does not come within the the letter or spirit of the prohibitory statute of 1840. I therefore hold, that whether they were issued to the Philadelphia banks, before or after the act of 1840 took effect, they are such obligations as the company had the right to issue. Nevertheless, these particular bonds, having been turned out to secure the payment of illegal bills and notes, they cannot be enforced, if the case of Leavitt v. Palmer is to be upheld. Having sat in the court on the argument of that case, and concurred in the decision, and having reconsidered the reasons for that decision, I am confirmed in their solidity. In that case the court treated the trust deeds as valid, but, being made as collateral to the notes which were void, they held the trust deeds not enforceable. Here, the bonds hold the same relation to the certificates of deposit as the trust deed did in that case. The result is, that the two hundred and seventy bonds turned out of the Philadelphia banks cannot be enforced, so as to entitle those debts to a preference; but being legal debts, they should be so adjudged, and allowed to come in as a charge on the general assets of the company.
I do not deem it necessary to inquire into the origin of all the debts due the Messrs. Palmer, which resulted in the large balance due them, on account, from the company. But in respect to that portion of it growing out of their acceptance and payment of the Davis bills, it is clear that it was not illegal in the Messrs. Palmer. The stock of the company had been purchased and paid for before the bills were drawn; and whether the purpose of the company, in allowing Davis to draw on the Palmers, was known to the latter before they accepted those bills or not, is of no legal importance. I hold it to be legal for one man to loan another money to pay an illegal debt, although he knows *Page 181 
the use for which the borrower designs it. Admitting the Messrs. Palmer knew that the company, through Davis, had bought in some of the capital stock, not with surplus funds of the company, and had paid for the same, and had drawn those bills to reimburse or replace the money thus used, still it was lawful for them to accept and pay those bills, at the request and on the credit of the company. There is a limit to human responsibility, in legal ethics at least, however, it may be in morals. The Messrs. Palmer were not responsible that the money should be used for a legal purpose.
It is quite uncertain whether the Messrs. Palmer sold the South Carolina Stocks to the company as principals, or as agents for one Simon, in August, 1840. But whoever was the vendor, the stocks were paid for soon after, by the company, out of the moneys received from Sanderson Co., to whom those stocks were pledged. The purchase of those stocks, to sell again, was an unauthorized transaction, according to Talmage v. Pell (3Seld., 328). Was the same question in this case as in that, I should feel bound to follow that case, however, I might doubt its correctness. But the question is quite different. In that case, the State of Ohio was attempting to enforce payment of securities turned out to it, as collateral to promises to pay for state stocks sold the company, in opposition to the rights of the receiver, who claimed to repudiate the contracts, and to reclaim the securities. The court held the purchase ultra vires, and, therefore, not binding on the company. Of course, the direct promise to pay being held illegal, the collateral securities failed also. In this case, the stocks have been sold, transferred and paid for specifically, and the Company have since transferred them, by pledge or sale, to Sanderson Co. The receiver now seeks, in effect, to recover back the money paid for those stocks, without offering to return them to the Messrs. Palmer *Page 182 
This claim strikes me as exceedingly unjust, and without precedent.
The eminently just principles enunciated by this court, in the case of Tracy v. Talmage, involving the claim of Indiana, will rescue all the other items in the accounts of Messrs. Palmer from the charge of illegality; and I forbear, therefore, to comment upon them in detail.