## BARKER and another vs. BARKER and others.

The common law with regard to champerty, with such qualifications as the authorities have established, still prevails in this state.

Mere relationship, by blood or marriage, will justify parties in assisting each other in their suits, so far as mutual affection and a regard for each other's rights and interests may induce them to do so, though such assistance might otherwise be objectionable on the ground of *maintenance*. But such relationship does not in all cases avoid the effect of *champerty*.

If the rule justifying mere maintenance between relatives is to be extended so as to allow a party, in any case, to contract for his compensation out of the property to be recovered, it can only be carried so far as is consistent with the idea that he is influenced by that desire to benefit his relative which the law approves, and not so far as to sustain a contract which entirely excludes that idea, and shows that he acts wholly from motives of self-interest.

The question whether a suit is prosecuted upon a champertous agreement, is one outside of the real merits of the case, and although no issue be formed in regard to it, if the fact comes to the knowledge of the court in any proper manner, it will refuse longer to entertain the proceeding.

A widow sued for partition of her deceased husband's estate, claiming to be the owner, by purchase, of the portions of A and B, two of the eight heirs. A and B and five of the other six heirs answered that the purchase was made with funds of the estate, held by the plaintiff as administratrix, and it was insisted that she should be adjudged to hold the same in trust for the heirs. On appeal to this court from a judgment in favor of the plaintiff, it appeared that the purchase was made *in part* with accounts of the estate against A and B, for the amount of which the plaintiff had never accounted to the probate court. *Held*, that the plaintiff must be adjudged to hold in trust for the heirs of the estate, such proportion of the shares of A and B, as the amount of said accounts bore to the entire consideration paid by her for their shares.

An administrator is not a trustee for the heirs, of the real property of the estate

Barker et al.
v.
Barker et al.

not necessary to be sold for the payment of debts, and may purchase in his own right, with his own funds, the interest of any of the heirs in such property.

A *cestui que trust* cannot have judgment against his trustee for the trust moneys which have come into his hands, and at the same time have land purchased by the trustee with such moneys adjudged to be trust property.

A decree of a probate court as to matters within its jurisdiction, is as conclusive as the judgment of any other court.

*Held*, therefore, that so far as the administratrix, in this case, had accounted to the probate court, in a valid proceeding, for the funds of the estate which had come into her hands, the heirs who had been duly notified of such accounting, were precluded by the judgment of the probate court thereupon, from following such funds, in any collateral proceeding, into real estate purchased by her therewith.

*Held*, further, that if the application of A and B for affirmative relief, in this case, had been properly made, they would each have been entitled to one-eighth of that portion of the estate adjudged to be held by the plaintiff in trust for the heirs.

But it appearing from the proofs, and from what occurred upon the argument, that the defense was maintained on the part of A and B in pursuance of an agreement between them and R, the husband of one of the other six heirs, that they should convey to R their respective shares, if recovered, in consideration of his carrying on the defense, and of a small sum to be paid to each on the making of the conveyance, it was *held*, that said agreement was *champertous*, and that the relief which A and B might otherwise claim, could not, for that reason, be granted them *in this action*.

*Held*, also, that the objection of champerty was not removed by the relationship of R's wife to A and B, which gave R a contingent interest in their success in the action, for the reason that her relationship to the plaintiff gave him a greater contingent interest in the plaintiff's success.

The court below was therefore directed to modify its judgment, by assigning to each of the other six heirs, one-eighth of the land adjudged to be held by the plaintiff in trust, and by providing that its assignment of the remainder to the plaintiff should be without prejudice to the right of A and B to bring a new action within a limited time to determine their interests in the premises.

A notice given at the trial to produce an original written contract, is insufficient to justify the admission of secondary evidence, where it appears that the party on whom such notice is served has not the paper in his possession at the place of trial.

But where a party was called upon at the trial to produce such original contract, and he and his counsel "said nothing," and they afterwards offered to show that "he resided at a distance of forty miles," without stating or offering to show that he had not the paper with him, the court was justified in assuming that he had the paper with him, and in admitting secondary evidence if he refused to produce it.

APPEAL from the Circuit Court for *Dane* County.

This was an action by *Phœbe Barker* and *Edwin Barker* for

partition of the real estate of which Job Barker died seized.
Phœbe Barker claimed to own two-eighths of the estate by pur-
chase from Walter Barker and Angeline March. Edwin Barker
claimed one-eighth by descent. The defendants in the suit
were Walter Barker, Angeline March, Mary Rogers, Cecilia,
George, Julius and Eugenia Barker, all of whom were children
and heirs of Job Barker deceased, and Leonard March, the
husband of Angeline March, and Anson Rogers, the husband of
Mary Rogers. The complaint was filed in August, 1857, in
the Rock circuit court, and the case was transferred to the
Dane circuit court. The defense set up by Walter Barker
and Angeline March is stated in the opinion of the court.
The answers of Mary and Anson Rogers and of Cecilia, George,
Julius and Eugenia Barker, alleged that all the consideration
paid by Phœbe Barker to Walter Barker and Angeline March
for their shares of said land, was paid out of the moneys of
the estate of Job Barker, deceased, which the said Phœbe
held in her hands as administratrix thereof, and prayed that
they might each be adjudged to be the owner of the one-
sixth of said shares, and that the same might be set apart to
each of them in severalty. Replies in denial.

At the trial, before any evidence was introduced, the plain-
tiffs moved to strike from the files the answer of Angeline
March, or to enter of record that she had withdrawn her
answer and appearance, and in support of the motion read
an instrument executed by her November 19, 1858, which
declared that she thereby revoked all the authority which
she had conferred upon any attorney to appear for her in
said action, and withdrew her answer therein, and disclaim-
ed any interest in the real estate in controversy, and con-
sented that partition should be made thereof according to
the prayer of the complaint. The counsel who appeared
for said Angeline objected to the motion, and the court sus-
tained the objection.

Upon the question whether the funds of the estate of Job
Barker were used by Phœbe Barker in the purchase of the
shares of Walter Barker and Angeline March, the evidence
was in part as follows: An account against Walter Barker
for $677 18, and one against Angeline March for $128 50,

were included in the inventory of the personal property of the estate. Upon the final settlement of the estate in the county court of Rock county, in January, 1857, *Phœbe Barker* charged herself as administratrix with the full amount of the inventory, but upon the credit side of her account there was, among other items, the following: "Account of *Walter* and *Angeline March*, used in purchase of their shares, $805 68." The county court found that after deducting the one-third belonging to her as widow, there remained in her hands as administratrix $4,112 45, for distribution between *Edwin*, *Mary*, *Cecilia*, *George*, *Julius* and *Eugenia*, (subject to offsets for support of each during minority), and decreed the residue of the estate to the six heirs just named in equal proportions, one-sixth to each, their heirs, &c. It was shown that a notice that the account of *Phœbe Barker*, as administratrix of said estate, would be settled before the county court of Rock county on the 7th of July, 1856, at 10 A. M., was, by order of said court, duly published for two successive weeks, ending 28th of June, 1856. In September, 1856, a guardian *ad litem* was appointed for *George*, *Julius* and *Eugenia Barker*, then infants. In March, 1857, *Phœbe Barker* appealed to the circuit court from the decree of the county court, and gave due notice of the appeal to *Edwin*, *Mary*, *Cecilia*, *George*, *Julius* and *Eugenia*, as the parties adversely interested, and in July, 1857, on the hearing of the appeal, by consent of counsel for the respective parties, so much of the decree of the county court as related to the apportionment of the real estate was reversed, and the decree in all other respects affirmed.

Upon the question whether other assets of the estate, besides the accounts above mentioned, were used in the purchase of those shares, and whether in making the purchases, there was any concealment of material facts, or misrepresentation or undue influence, the evidence in the case becomes, under the decision of this court, unimportant, and is omitted.

The evidence tending to show that the defense of *Walter Barker* and of *Angeline* and *Leonard March* was carried on by *Anson Rogers* under a champertous agreement was as fol-

lows : To a question put to *Leonard March* in a deposition taken March, 1859, concerning his interest in the present suit, he answered : " I have an interest in the event of this suit and in the subject matter of it.   There are no contingencies in this matter.   I have appointed and authorized *Anson Rogers* to recover our interest in the estate of Job Barker deceased, for which we have given him a power of attorney and a contract for the purchase of the same, which I propose to abide by.   The suit is to be carried on for our benefit, and we expect to receive our proportion of whatever judgment can be obtained." To a similar interrogatory, *Angeline March* answered : "I have an interest in the event of this suit, to the extent of my equitable interest in said estate, deducting therefrom the amount we have received. The only contingency is in the result of the suit." *Phœbe Barker* was offered as a witness for the plaintiffs ; but the court held, that as no notice of her examination had been given to *Walter Barker*, *Anson Rogers* or *Mary Rogers*, and as said *Walter* and *Mary* were not present, her testimony could not be received to affect them, but might be received as against *Leonard* and *Angeline March*. The witness then testified among other things as follows : " I have had a conversation with *Angeline* about this suit since it was commenced.   It was last fall.   She said she was perfectly satisfied with what she had, and had never thought otherwise ; that she did not know anything about such a suit [as this] being commenced ; that *Anson Rogers* told her that there was a little difficulty about the title of *Mary Rogers* in the land, and he wanted to sell her interest, and that the man he contracted with, would not take it without he could have her name in the way he wanted it.   She was very loth and would not have done it if she had thought it would have injured any one or made any trouble.   She said she could not see any reason for her signing it away again, and was very sorry after she did it." The counsel for the plaintiffs here gave verbal notice to *Anson Rogers*, who was in court, to produce the original of an instrument in writing, shown to the court, and stated by said counsel to be a copy of a contract between *Angeline* and *Leonard March* and the said *Rogers*,

selling or agreeing to sell to him their entire interest in the estate of Job Barker deceased, dated March 24th, 1857 ; and they gave the same notice to the attorneys of the defendants *Walter, Angeline* and *Leonard ;* to which said attorneys and said *Rogers* said nothing, nor did they produce the original instrument. The counsel for the plaintiffs then offered said copy in evidence, to which the counsel for *Rogers,* and for *Walter, Angeline* and *Leonard,* objected, for the reason that it had not been shown to be a copy of any contract, nor had it been shown that the original of said instrument then was or ever had been in the possession of said *Rogers* or of the counsel for him, or of the said *Walter, Angeline* and *Leonard ;* and offered to prove that said *Anson Rogers* was forty miles from his residence, and that said *Angeline* and *Leonard* resided in Illinois, and were not in attendance upon the court, for the purpose of showing that the notice to produce the original was insufficient. The plaintiff's counsel then asked the witness, " Was the contract shown you by *Mrs. March,* signed by *Mr.* and *Mrs. March* and *Anson Rogers ?"* The question was objected to by the counsel for *Walter, Angeline, Leonard, Mary* and *Anson,* for the reason that if the contract was so signed, it would not dispense with the production of the original, and because it did not appear that the witness knew the handwriting of the persons whose signatures were in question. The objection was overruled, and the witness answered, " It was signed by *Angeline,* and purported to be signed by *Rogers* and *Leonard."* The counsel for the plaintiffs then called J. A. Sleeper, Esq., as a witness, and asked him to state what he knew of the paper [being the copy referred to], and whether it was in his handwriting. The question was objected to, and the objection overruled. The witness answered, " I copied it from a paper I got of *Edwin Barker,* one of the plaintiffs. After I copied it, I compared it, and then delivered both to *Edwin Barker,* and he afterwards returned this copy to me. This was done on the 23d of November, 1858." The copy was then admitted in evidence, over the objection and exception of the defendants *Walter, Angeline, Leonard, Mary* and *Anson.* This instrument was dated March 26th, 1857, purported to be signed by *An-*

*geline* and *Leonard March* and *Anson Rogers*, and after reciting that "whereas, controversies have arisen and been moved or may hereafter, between *Phœbe Barker*, administratrix of the estate of Job Barker deceased, or between her, in her right, claiming the share originally belonging to said *Angeline* in said estate, either real or personal, or both—said *Phœbe* claiming to have purchased the same of the said *Angeline* heretofore; and whereas, it is deemed necessary to institute or carry on said controversy to a final determination in favor of said *Angeline*; and whereas, the said *Rogers* proposes to test the same in law," therefore, to that end, for the consideration thereinafter, on the part of said *Rogers*, covenanted to be paid and performed, the said *Leonard* and *Angeline* agreed, on the termination of said suits, to execute to said *Rogers*, his heirs, &c., a warranty deed to all the lands, with the rents and profits thereof, and also to transfer to the said *Rogers* all the personal estate which might be recovered in said suits; and the said *Rogers* on his part agreed that on the delivery of such deed and the transfer of such personal property, he would pay to said *Angeline* one hundred dollars; and it was further agreed that if such suit or suits should terminate against the said *Angeline*, said *Rogers* was to take nothing; and the said *Rogers* agreed that he would "pay all the costs, expenses and charges of said suits, and of counsel to prosecute the same, and keep the said *Leonard March* and the said *Angeline* at all times harmless and indemnified from and against the same." After the copy was read, *Phœbe Barker* further testified: "I have had conversations with *Leonard March* since this suit was commenced. He said he was not acquainted with *Rogers* [at the time of signing the contract]; that he had then seen him but once, and did not know but he was a man of truth; that *Rogers* represented to him that there had been most abominable frauds in the settlement of the estate; that was the reason of his signing the papers. He said he did not know of any fraud himself; that he would not have signed the paper since he had discovered how he had been imposed upon." This testimony was objected to as irrelevant, and exception taken. The plaintiffs also read in evidence, over the objection of

Walter, Angeline, Leonard, Mary and Anson, a certified transcript of an agreement between Walter Barker and Anson Rogers, dated March 18th, 1857, of the same import as the contract already introduced between Anson Rogers and Walter and Angeline March. The defendants, Walter, Angeline and Leonard, then read in evidence two letters of attorney executed in March, 1857, the one by Leonard and Angeline March, and the other by Walter Barker, to Anson Rogers, by which said Rogers was appointed the attorney for them and each of them, in their names, jointly or severally, to prosecute all actions pending in their names, or for their benefit, or any that might be thereafter so prosecuted, and to commence and fully to control all and any that he might see fit to commence and prosecute in their names, for their benefit, to final judgment; to compound and settle the same on such terms as he should think best, and most for their interest; and to make and execute all manner of releases and discharges necessary for the progress thereof; which powers of attorney were declared to be irrevocable.

The circuit court found that the purchase of the interests of Walter and Angeline in the estate by Phœbe Barker, was fairly made, and that she paid the consideration without using therefor the moneys of the estate in her hands as administratrix, and adjudged that she was entitled to two-eighths of the land described in the complaint, and Edwin Barker to one-eighth, and Mary Rogers and Cecilia, George, Julius and Eugenia Barker each to one-eighth, and that partition be made accordingly. From this judgment Walter Barker, Angeline and Leonard March and Mary and Anson Rogers appealed.

Mat. H. Carpenter, for Anson Rogers and wife: [Mr. Carpenter's brief on the first hearing of the case not being on file, the points made by him on the motion for a rehearing are inserted].

1. The copy of the alleged contract between Rogers and Walter and Angeline March was improperly admitted in evidence, because the notice to produce the original was insufficient. (Hargest vs. Fothergill, 5 Car. & Payne, 303; Rex vs. Ellicombe, 5 id., 522; Rex vs. Haworth, 4 id., 254; Doe vs. Spitty,

3 Barn. & Adol., 182; 1 Moody & Rob., 259; *Gorham vs. Gale*, 7 Cow., 739; *Utica Ins. Co. vs. Cadwell*, 3 Wend., 296; *McPherson vs. Rathbone*, 7 Wend., 217; *Durkee vs. Leland*, 4 Vt., 615); and because there was no proof that the original was in the possession of either of the parties to whom notice was given (*Life & F. Ins. Co. vs. M. Ins. Co.*, 7 Wend., 34; *Birbeck vs. Tucker*, 2 Hall, 121), but on the contrary, the proof showed the original to be in the hands of *Edwin Barker*, one of the plaintiffs; and lastly, because the execution of the original instrument had not been legally proved. *Sharpe vs. Lamb*, 11 Ad. & El., 805. 2. The law of champerty does not prevail in this state. We had at that time no statute punishing maintenance or champerty, and section 7, chapter 59, R. S., 1849, which was in force at the time, is in direct hostility to the common law on this subject. *Danforth vs. Streeter*, 28 Vt., 490. Sec. 214, Code of 1856, abolished the law of maintenance and champerty, if it had ever existed in this state. *Benedict vs. Stuart*, 23 Barb. (S. C.), 420. 3. Again, it is not illegal to maintain a litigation in which one is or believes himself to be interested, or is of kin to either party. 20 Ala., 521; *Sayles, adm'r, vs. Tibbitts, adm'r*, 5 Rhode Island, 79; *Perrine vs. Dunn*, 3 Johns. Ch. R., 508. If the two shares were purchased by *Phœbe Barker* with trust funds, the wife of *Rogers* was entitled to one-sixth of the shares, and he was entitled to a life estate in them as tenant by the curtesy; he had, therefore, a direct pecuniary interest in having that question settled between the two heirs and the administratrix. 4. But champerty in the contract for carrying on the suit is no defense to the administratrix, though it might be a defense between *Rogers* and the heirs, if he should ever try to enforce it against them. 5. The purchase of the shares of the two heirs by the administratrix, was the purchase of the trust property by a trustee from the *cestui que trust*. *Michoud vs. Girod*, 4 How. (U. S.), 552.

*James H. Knowlton*, for *Walter Barker* and *Angeline* and *Leonard March*:

1. There was no such offense at common law as champerty or maintenance; nor were contracts considered

invalid at common law, on the ground of champerty or maintenance, except upon the principle that the act was punishable by statute (*Small vs. Mott*, 22 Wend., 405), and there was no statute in force in this state, forbidding or pre-scribing any punishment for maintenance or champerty. Upon this point were cited 3 Green (Iowa), 432; *Sedgwick vs. Stanton*, 14 N. Y., 289; *Durgin vs. Ireland*, id., 322. 2. The contracts, if champertous, constituted no bar to the relief asked by the defendants. *Hall and wife vs. Gird*, Hill, 586; 6 Texas, 279-283; 5 Pick., 353-60; 8 Johns. 226; 5 id., 503. 3. The contracts were not champertous because the wife of *Rogers* may by possibility inherit the property in controversy. *Thallhimer vs. Brinckerhoff*, 3 Cow., 624; *Gilleland vs. Failing*, 5 Denio, 309; 22 Wend., *supra*; 3 Green, *supra*. 4. If the contracts were void, the question of their validity could only arise in a suit brought to enforce or cancel them, and *Mrs. Barker* cannot raise that question, nor claim to hold an estate improperly obtained by her, on the ground that the contracts are illegal. 5. Neither the decree in the probate court nor that in the circuit court on her appeal, precludes the heirs from showing that the shares of *Angeline* and *Walter* were paid for with the funds of the estate *exclusively*, nor did it constitute an election to take the money instead of the land. The infant heirs could not elect, nor could *Mrs. Rogers* make an election, which would bind her, until she became *discovert*. The decree is simply an ascertainment of the state of the administratrix's account; this done, the statute gives each heir a right to de-mand the *pro rata* share thus assigned to him. The record does not show that any such demand has ever been made, or that any portion of the balance ascertained to be in her hands has ever been paid.

*Geo. B. Smith* and *John R. Bennett*, for the plaintiffs, to the point that *Phoebe Barker*, by virtue of her character as administratrix, did not stand in the relation of trustee to-wards *Walter* and *Angeline* as to the real estate, cited 5 Cow., 601; 1 Barb., 542; 2 id., 613; 10 id., 432; 16 Mass., 280; 11 Pick., 345; 4 Mass., 353.

*By the Court*, PAINE, J.   This suit was brought by the re- June Term, 1861.
spondents to obtain partition of certain real estate.   The
complaint sets forth that Job Barker died leaving the re- BARKER et al.
spondent *Phœbe* his widow, and *Walter Barker* and *Angeline* v.<br>BARKER et al.
*March*, two children by a former wife, and six children by 1860.
said *Phœbe*, his heirs at law, each entitled to one-eighth of July 10.
the real estate, subject to her right of dower.   It avers that
her dower had been assigned, and that she had purchased
the shares of *Walter Barker* and *Angeline March*, but that
notwithstanding the purchase, they still pretend to have
some interest in the premises.

Answers were filed by *Walter Barker* and *Angeline March*,
claiming that the purchase of their shares was void by rea-
son of fraud, consisting of concealment of material facts,
misrepresentation and undue advantage on the part of
*Phœbe Barker*, who was administratrix of the estate at the
time.

The first question is, whether these purchases are to be
set aside.

But if not set aside, it is then claimed that the adminis-
tratrix, in making them, used the funds belonging to the es-
tate, and that therefore, instead of being entitled to these two
shares in her own right, she should be adjudged to hold
them in trust for the other six heirs.   The decree of the
court below was in favor of the respondent *Phœbe Barker*.
The infant heirs were represented by a guardian *ad litem*,
but have not appealed.   And the position last referred to,
is urged here only by *Anson Rogers* and *Mary Rogers*, the
latter being one of the heirs.

Upon the first question, the conclusion to which we have
come will preclude an examination of its merits upon the
testimony.   We might say, however, that we are satisfied
that no actual fraud or deceit was practiced by *Phœbe Barker*
in the purchase of the two shares.   And if the sales could
be set aside at all, it could only be by an application of those
rules which govern in the case of a purchase of trust pro-
perty, by a trustee from the *cestui que trust*, which it was
contended were applicable here.

But we are fully satisfied from what appeared in proof,

as well as from what occurred on the argument, and the positions assumed by counsel in their briefs, that so far as the interests of *Walter Barker* and *Angeline March* are concerned, this defense is prosecuted entirely by *Anson Rogers*, in pursuance of an agreement that they were to convey to him their respective shares, if recovered, in consideration of the sum of one hundred dollars to be paid by him to each on the making of the conveyance.

We think therefore that this defense, which is in substance a suit to set aside the sales for fraud, seeking affirmative relief, is prosecuted in pursuance of a champertous agreement, and that for that reason it ought not to be entertained by the court.

It may be that some of the evidence going to show this agreement would not have been admissible upon the strict rules applicable to evidence upon the merits of the case. But the question whether a suit is prosecuted upon a champertous agreement, is one outside of the real merits of the case. And although an issue might possibly be made on it, yet we think it need not necessarily be pleaded, but that if it comes to the knowledge of the court in any proper manner, it will refuse longer to entertain the proceeding. It would seem to stand upon similar grounds with an action for divorce prosecuted by collusion between the parties. The court, in arriving at a knowledge of the fact, would not be confined to the strict rules applicable to evidence offered on the trial of the case, though it undoubtedly should not proceed upon mere suspicion, or without giving opportunity for avoiding the alleged champerty by proper proofs on the other side. In this case the evidence is such as leaves no doubt in our minds of the existence of the agreement, and its existence is assumed in the brief of counsel for the appellants.

The strictness of the law relating to champerty and maintenance has been greatly relaxed, and with reason; yet it is still very generally recognized as an existing substantive part of the common law, and has been frequently enforced by the courts of this country. *Rust vs. Larue*, 4 Litt., 411; *Brown vs. Beauchamp*, 5 Mon., 413; *Hoyt vs. Thompson*, 3 Sandf. S. C. Rep., 430; *Arden vs. Patterson*, 5 Johns.

Ch. Rep., 44; *Thompson vs. Warren & wife*, 8 B. Mon., 488;     June Term,
*Lathrop vs. Amherst Bank*, 9 Met., 489.                   1861.

The remarks of the court in the case last mentioned seem   BARKER et al.
to us proper to be adopted here. They notice the fact that    v.
the law upon the subject had been much relaxed, yet upon    BARKER et al.
the ground that it was a well established part of the common law, and generally recognized as such, although there was no statute in regard to it in that state, they held that if reasons existed for its abrogation it should be done by the legislature and not by the courts.

In *Webb vs. Armstrong*, 5 Humph., 379, it was held, that if it appeared satisfactorily to the court in proof, that the suit in its origin and progress was affected by champerty, it was its duty "not to permit itself to become the organ and instrument to consummate such agreements, but to repel the plaintiff and his suit." See also *Morrison vs. Deaderick*, 10 Humph., 342. In *Hunt vs. Lyle et al.*, 8 Yerg., 142, a bill in equity had been filed to enjoin a judgment obtained in pursuance of a champertous agreement. The court said: "If there was champerty in prosecuting the suit at law, application ought to have been made to that court, the fact ascertained, and the suit dismissed."

We feel bound therefore to hold that, with such qualifications as the authorities have established, the common law in regard to champerty prevails in this state, and that on its appearing to the court, in any satisfactory manner, that a suit is prosecuted in pursuance of a champertous agreement, it ought not further to entertain it.

But it is claimed that the effect of this doctrine is avoided by the fact that *Rogers* was related by marriage to *Walter* and *Angeline*, his wife being their half sister, and also that he had, by reason of that fact, an interest in litigating the question. Several authorities were cited sustaining the general proposition, that the common law rules upon this subject have been considerably modified; which causes were mostly as to the sale of lands held at the time by adverse title.

But the case bearing most nearly on the point was that of *Thallhimer vs. Brinckerhoff*, 3 Cow., 623. The court of er-

rors in that case reversed the decision of the supreme court, 20 Johns., 385, where the agreement was held champertous. But although some reliance was placed upon the relationship, one party having, as in this case, married the other's sister, yet the decision of the court of errors seems to be placed principally upon the ground of interest, it being held that the sister might inherit from her brother on a failure of other heirs, and therefore her husband had a contingent interest in the litigation. But so far as this reason for the decision is concerned, it is obvious that it does not exist here. For although *Rogers's* wife was the half sister of *Walter* and *Angeline*, and might possibly inherit from them, yet she was the daughter of *Phœbe Barker*, and in the absence of a will, must *necessarily* inherit from her. The interest derived from the relationship here was therefore in favor of sustaining the title of *Phœbe*, instead of that of *Walter* and *Angeline*.

But it is true that the opinion of the chancellor furnishes support for the proposition that the relationship alone would justify the one party in maintaining the suit of the other. And it must be conceded as established that a near relationship either by blood or marriage, will justify what would in its absence be maintenance. The counsel in the case of *Thallhimer vs. Brinckerhoff*, contended with great force that there was a distinction between maintenance and champerty in this respect, and that while relationship might justify the former it could not the latter. There is a clear distinction between the the two offenses, though champerty is a species of maintenance. But the opinion of the chancellor rejects this distinction, so far as the justification by relationship is concerned, and holds that wherever mere maintenance would be justified, the party maintaining may contract for his compensation, as well out of the property to be recovered, as of any other. But this proposition seems liable to serious question when the object of the law against champerty is remembered. That object is to prevent strife and litigation, and this it aims to secure by forbidding parties not interested to contract for an interest in the thing to be recovered, upon condition of their carrying on the suit. Now mere maintenance among relatives is not inconsistent with this object.

That merely allows them to assist each other in their suits,
so far as their mutual affection and regard for each other's
rights and interests might induce. This excludes the motives
of self interest, which come in play as soon as they are allowed
to contract for a share of the thing to be recovered, which
is champerty. There seems therefore to be a well founded
distinction between champerty and maintenance so far as a
justification by relationship is concerned. For if this is al-
lowed to justify champerty to every extent, it is obvious
that it might result in producing the evil which the law de-
signed to prevent, in its worst forms, while the reasons upon
which relatives have been allowed to justify maintenance
would almost entirely fail. For the party might contract
for the entire chance of gain, leaving the original owner a
mere nominal sum for his interest. Such a contract would
show clearly that the party was stimulated by a spirit of ac-
quisition for himself, and not acting at all from that regard
for the rights of his relative which the law allows as a justi-
fication of maintenance. We think therefore that if the rule
justifying mere maintenance between relatives is to be ex-
tended so as to allow the party to contract for his compen-
sation out of the property to be recovered in any case, it can
only be carried so far as is consistent with the idea that he
is influenced by that desire to benefit his relation, which the
law approves, and not so far as to sustain a contract which
entirely excludes that idea, and shows that he acts wholly
from motives of self-interest, having bought his relative's
right to litigate for a mere nominal consideration. We think
the very reason and object of the law requires that the ex-
ception be confined to these limits. For whatever reason
there may have been for modifying the ancient strictness of
the law on this subject, we are not prepared to admit that
the law itself should be entirely abrogated. For there is
undoubtedly a class of persons constantly engaged in prying
into old rights and titles, for the purpose of discovering de-
fects which would soon have been hidden forever under the
dust of prescription, that they may buy out the interests of
the original owners and litigate upon speculation. We think
the encouragement of this practice is against public policy,

June Term,
1861.

BARKER et al.
v.
BARKER et al.

and that when it assumes the form of a champertous agreement, courts should decline to enforce it, and that where it is obvious that such is the real character of the transaction, as we think it is here, it ought not to find shelter under the thin guise of fraternal feeling which is attempted to be spread over it. We think therefore that the decision of the court below, refusing to sustain the defense set up for *Walter Barker* and *Angeline March*, must be affirmed, for the reason that it was conducted by *Anson Rogers* under an agreement grossly champertous in its character.

In regard to the other question, it is clear that the administratrix did use at least a part of the funds of the estate in purchasing the shares of *Walter* and *Angeline*. And the other heirs would undoubtedly be entitled to have those shares treated as trust property, to some extent if not entirely, unless that result is prevented by other facts appearing in the case. And we think it is prevented by the fact that the administratrix has accounted before the probate court, whose decree was affirmed by the circuit court, for all the property of the estate which ever came into her hands. It seems clear that the heirs are not entitled to hold her to this account, upon which she pays back all the property of the estate for which she was ever liable, and also to follow any particular portion of it which she may have applied to the purchase of real estate in her own name, into the real estate, and have that adjudged to be held in trust for them. This may be illustrated by any case of ordinary trust. If the trustee uses the funds to buy real estate in his own name, the *cestui que trust* has an election either to hold him personally responsible for the money, or to follow it into the land and have that adjudged trust property. But he cannot do both. And electing the one remedy is a waiver of the other.

It appears from the record that the proper notice of accounting was published, and also that the heirs, with the exception of *Walter* and *Angeline*, were represented in the probate court and in the circuit court. The items used by the administratrix in the purchase of these shares, are contained in the account, and are included in the balance of over four thousand dollars, for which a decree was rendered against

June Term,
1861.

BARKER et al.
v.
BARKER et al.

her. It is too late after having elected to hold her responsible personally, and obtaining this decree, for the heirs to attempt to follow the property into the land and hold that also. The decree of the probate court as to matters within its jurisdiction, is as conclusive and final as the judgment of any other court. *Watson vs. Hutto*, 27 Ala., 513; *Tebbets vs. Tilton*, 4 Foster (N. H.), 120. But here that decree was appealed from, and affirmed by the circuit court, so that it is as conclusive and binding between the parties, as to the matters included in it, as any other judgment of that court.

For this reason we think the judgment of the circuit court must be affirmed, with costs.

A re-hearing was afterwards granted, and the case was finally disposed of by the following decision:

*By the Court*, PAINE, J. A motion for a re-hearing was granted in this case, for the reason that upon one point our former decision was based upon a mistake of fact. We supposed that the administratrix had fully accounted before the probate court for all that she received from the estate, including the two accounts against *Walter* and *Angeline*, used by her in the purchase of their shares. But it appears from a closer inspection of the account, that although she was charged with those items in one part of it, she was credited with them in another, thus leaving them out of the general balance against her, and leaving the heirs at liberty to follow, to that extent, the trust funds into the lands purchased by her. The result of applying the principles stated in the former opinion to this state of facts, is, that *Phœbe Barker* must be adjudged. to hold in trust for the heirs of the estate, such proportion of the shares of *Walter* and *Angeline*, as the amount of the accounts against them was of the entire consideration paid by her for their shares. If any of the trust funds, beyond the amount of those two accounts, was actually used to pay for those shares, for that the administratrix has accounted, and the rule stated in the former opinion must govern. The heirs cannot have a personal

1861.
August 21

judgment against her for the amount so used, and also hold the land.

But *Walter* and *Angeline* being equally interested with the other children in the personal property of the estate, would be equally entitled with them to an interest in that portion of their shares which the administratrix is adjudged to hold in trust for the heirs. They would therefore be entitled to have adjudged to them each one-eighth of that portion, in this suit, were it not for the fact that the entire defense on their part, which sought first to set aside their sales entirely, and secondly to establish the trust in their favor, is carried on by the defendant *Rogers* in their names, in pursuance of a champertous agreement. Our conclusion as to the existence of the law of champerty in this state was vigorously assailed on the re-argument; but after carefully considering what was then said, we are not disposed to change it. It is true that some courts in this country have held that part of the law obsolete; but we think with the supreme court of Massachusetts, referred to in our former opinion, that if a change is desirable, the legislature and not the court should make it. Nor do we think any of the statutes referred to have that effect. Sec. 214 of the Code of 1856 was designed merely to leave the matter of the fees of attorneys and counsel to the agreement of the parties, and was obviously not intended as a repeal of the law of champerty, else it would not have been confined to the employment of one class merely. Nor does the repeal of the law making void conveyances of land held adversely to the grantor, relate directly to the law of champerty. That law may have been founded on the same policy, but it was a provision entirely distinct from that concerning champerty, and the one may exist or not exist without any reference to the other. We must therefore hold that with such relaxations as were referred to in the former opinion, the law of champerty exists in this state. But there is a peculiar difficulty in applying that law to this case. Ordinarily the parties to a champertous agreement appear as plaintiffs, and a dismissal of the suit would not be a bar to a new suit freed from champerty. But here the parties to the champerty appear as defendants, asking

affirmative relief, and if their application, so far as asking such relief is concerned, is dismissed, and an absolute judgment given for the plaintiff in the partition suit, that would undoubtedly be a bar to a new suit by these defendants, though free from any champerty. The fact that they appear as defendants asking affirmative relief, ought not on the one hand to relieve them from the effects of the law of champerty, nor on the other to subject them to a severer penalty than ordinarily results from its application. We can see no way therefore, by which the law as we have held it, upon that subject, can be applied to this case, except by dismissing the application of *Walter* and *Angeline* for affirmative relief, and settling the rights of the parties as they would then appear, without prejudice to the right of *Walter* and *Angeline* to bring a new suit within a limited time, to obtain whatever rights they may really be entitled to.

<em>June Term, 1861.</em><br/>BARKER et al.<br/>v.<br/>BARKER et al.

In our former decision we stated that we were satisfied from the evidence, that no actual fraud was practiced by the widow in the purchase of those shares, by which the sale could be set aside. We will now add, upon a further consideration of the question, that we are satisfied that she did not stand in any such relation to them, as would avoid the sale by an application of the law concerning the purchase of the trust estate by the trustee from the *cestui que trust.* Where that rule is applicable, we have adhered to it strictly. *Gillett vs. Gillett,* 9 Wis., 194. But here we think the relation of trustee and *cestui que trust* with respect to the real estate, did not exist. The administratrix had no title to it, but it descended to the heirs. True it was liable, if necessary, to be sold to pay the debts of the deceased, by virtue of a statutory proceeding for that purpose. But in this case the necessity authorizing such a proceeding did not exist; no such proceeding was had; and the mere possibility of it in case the necessity had existed, does not make the administratrix the trustee of the heir, and incapacitate her from purchasing his interest in the real estate.

It follows therefore that all that *Walter* and *Angeline* would in any event be entitled to, is each one-eighth of the

portion which the administratrix is adjudged to hold for the heirs.

It was contended by the counsel that the court below improperly admitted in evidence the copy of the champertous agreement, because the notice to produce the original was only given at the trial. Such a notice is undoubtedly insufficient to justify the admission of secondary evidence, where it appears that the party notified has not the paper in his possession at the trial. But we think the facts stated in the case would have justified the court below in inferring that he had the paper present. When called on to produce it, he and his counsel "said nothing." Afterwards they offered to show that "he resided at a distance of forty miles," without however stating or offering to show that he had not the paper with him. We think upon such conduct the court was justified in assuming that he had the paper with him, and in admitting secondary evidence if he refused to produce it.

The result of our conclusions requires the judgment of the circuit court to be modified by deducting from the land awarded to *Phœbe Barker*, six-eighths of the portion hereinbefore indicated as held in trust by her for the heirs, and by adding one-eighth of that portion to each of the shares of the six children by the second marriage. This would still leave two-eighths of that portion with *Phœbe Barker*, but the judgment to be entered without prejudice to the rights of *Walter* and *Angeline* to bring suits within a limited time, freed from champerty, to recover each an eighth. The only doubt we have had as to the propriety of such a judgment, arose from the provisions of the statute relating to partition, requiring the court to settle the rights of the parties, and to render a judgment that "the partition made shall be firm and effectual forever," &c. But we have come to the conclusion that this was not designed to prevent the possibility of a conditional judgment in such cases, where the attainment of justice and the preservation of the rights of the parties seemed to make it essential. The judgment would then have all the effect given to it by the statute, subject to the conditions expressed on its face.

The judgment is modified as before stated, and the cause remanded with directions to enter a judgment accordingly; and we shall allow costs to neither party in this court.