Bent v. Priest.

BENT, *Receiver, Plaintiff in Error and Respondent,* v. PRIEST, *Appellant and Defendant in Error.*

1. **Agents and Trustees**: PROFITS MADE IN BUSINESS OF PRINCIPAL. An agent or trustee cannot unite in himself the opposite character

| 86 | 475 |
|----|-----|
| 104 | 580 |
| 105 | 682 |

| 86 | 475 |
|----|-----|
| 107 | 590 |

| 86 | 475 |
|----|-----|
| 50a | 434 |
| 53a | 218 |

| 86 | 475 |
|----|-----|
| 117 | 295 |

| 86 | 475 |
|----|-----|
| 120 | 393 |

| 86 | 475 |
|----|-----|
| 126 | 401 |

| 86 | 475 |
|----|-----|
| 75a | 465 |

| 86 | 475 |
|----|-----|
| 148 | 182 |
| 148 | 393 |
| 80a | 144 |

| 86 | 475 |
|----|-----|
| 155 | 522 |

| 86 | 475 |
|----|-----|
| 88a | 142 |

Bent v. Priest.

of buyer and seller and if he does so, the profits made by him ma -
be charged with a trust for the benefit of the principal, unless the
latter confirm the transaction with full knowledge of all the facts.
So, too, if the agent make gains from the use of the trust funds or
property, he must account therefor and if the agent accept any
benefits in conducting the business of his principal he will hold
them in trust for the latter.

**2. Directors of Corporation:** AGENTS AND TRUSTEES. The direc-
tors of a corporation are trustees and agents of it and the stock-
holders, and, in general, are governed by the same rules as are
applied to trustees and agents.

**3.** ——: ——. By accepting the office a director of a corporation
undertakes to give his judgment and influence to its interests in all
matters in which he represents or professes to represent it.

**4.** ——: ——. The defendant, a director in a life insurance com-
pany, in consideration of certain railroad bonds delivered to his
business partner, agreed to and did advocate and vote for the
assignment of the company's policies to another company and for
the reinsurance of the same in the latter company; *held,* that so
many of the bonds as defendant received belonged to the corpora-
tion of which he was a director, and on his failure to produce the
same a judgment for their estimated value was rightly entered.

**5.** ——: ——. There could be a recovery only for the bonds re-
ceived by the defendant, and not for those retained by his business
partner, the latter not being a party to the suit and having held no
fiduciary relation with defendant's corporation.

**6. Statute of Limitations.** The statute of limitations commenced
to run against the corporation only from the time it had knowl-
edge of the agreement and acquisition of the bonds.

**7. Champerty.** Unless the plaintiff's title, by which he seeks to en-
force a right, is infected with a champertous agreement, he may
proceed with his suit, and this is the case although such illegal
contract may exist between the plaintiff and his attorney. A party
will not be turned out of court because of a champertous con-
tract, until he asks the aid of the court to enforce it.

*Appeals from St. Louis Court of Appeals.*

AFFIRMED.

*A. J. P. Garesche* and *J. M. Holmes* for appellant,
Priest.

'(1) The action, if it ever existed, was included in

the transfer to the Mound City Company. (2) The action is brought under a champertous agreement and plaintiff cannot recover. *Arden v. Patterson*, 5 John. Ch. 44; *Weekly v. Hall*, 13 Ohio, 175; *Webb v. Armstrong*, 5 Humph. 381; *Rives v. Weaver*, 36 Miss. 383; *Barber v. Barber*, 14 Wis. 143; *Greenman . v. Cohic*, 61 Ind. 206; *Gilbert v. Holmes*, 64 Ill. 556; *Cardwell v. Sprigg*, 7 Dana (Ky.) 39; *Marks v. Jordan*, 3 B. Mon. 116; *Crowley v. Vaughan*, 11 Bush (Ky.) 517; *Coughlin v. N. Y. & H. Railroad*, 71 N. Y. 452; *Vincent v. Ashley*, 3 Head (Tenn.) 594; *Haynes v. Coyne*, 10 Tenn. 343; *Barnes v. Strong*, 1 Jones Eq. (N. C.) 100. Champerty is *malum in se.* 2 Bacon's Abridg't 186; Weeks on Att'ys, 166; *Brown v. Beauchamp*, 5 Mon. (Ky.) 416. And our statute adopts the common law. 1 Code, 521, secs. 3117–3118; *Duke v. Harper*, 66 Mo. 58. The abandonment of the bond since suit brought don't impair the defence. For the right to recover depends upon the facts when suit was brought, the *statu quo ante bellum.* *Norcom v. D'Oench*, 17 Mo. 115; *Weinrich v. Render*, 33 Mo. 83; *Hunt v. Thompson*, 51 Mo. 155; *Norfleet v. Russell*, 64 Mo. 178; *Wilson v. Garaghty*, 70 Mo. 519; *Dunlap v. French*, 76 Mo. 108; *Hermann v. Brewster*, 7 Bush (Ky.) 355. (3) This action is barred by the statute of limitations. *Wilmerding v. Russ*, 33 Conn. 67; *Smith v. Riccords*, 52 Mo. 581; s. c., 56 Mo. 553: *Rogers v. Brown*, 61 Mo. 187; *Wood v. Carpenter*, 101 U. S. 135; *Cole v. McGlattery*, 9 Me. 131; *Mudd v. Hamilton*, 8 Allen, 130; *Webster v. Newbold*, 41 Pa. St. 482; *Murray v. Coster*, 20 Johns. 576; *King v. Bloodgood*, 7 Johns. 114; *Hawley v. Cramer*, 4 Cowen, 717; *Robinson v. Hook*, 4 Mason, 151; *Clark v. Bowman*, 18 Wallace, 493; *Beckford v. Wade*, 17 Vesey, 87; *Gebhardt v. Sattler*, 40 Iowa, 157; *Haymond v. Kealy*, 3 Cranch C. C. 325; *Farnham v. Brook*, 9 Pick. 242–248; *Martin v. Bank*, 31 Ala. 113; 1 Bailey S. C. ch. 304. (4) The evidence don't establish a cause of

action.   10 House of Lords, 26; *Bank of London v. Tyrrel*, Story's Conf. Laws. (8 Ed.) sec. 249.   (5) It is incumbent on defendant to make out the defence under the statute of limitations.   He has the means of showing when Wyman received these bonds; or at any rate he ought to have such means.   These particulars were and always have been concealed from us.   If the point be left in obscurity the decision must be against him who fails to sustain his plea, though he possesses the means of so doing; or at any rate, the means of showing the facts, whether they sustain his plea or not. (6) But the matter was kept secret at the time; was not a matter of which the St. Louis Mutual Life Insurance Company had any notice or knowledge, and was only discovered by the representative of the St. Louis Mutual Life Insurance Company about a year before the hearing; in other words, cotemporaneously with the institution of this suit.   (7) The plaintiff brings himself within the saving clause of the statute (W. S., chap. 89, secs. 8, 10), and the defendant has wholly failed to prove, as it was incumbent on him to do, that more than five years had elapsed since the bonds were received by Wyman. (8) The question whether or not a champertous contract was made between the receiver and his counsel has no relevancy.   The receiver does not rely to maintain his action on any instrument or oral contract tainted with a champertous agreement.

*T. T. Gant* and *J. M. Glover* for respondent, Bent.

(1)   Whatever was received by Wyman was received by Priest.   He turned Peck over to Wyman for conference and settlement and is answerable for whatever came into Wyman's hands in the same manner precisely as if he had received it in his own hands.   *Shines v. Bank*, 70 Mo. 524.   (2) The money or property thus coming to Wyman's or to Priest's hands was the consideration

paid for Priest's action in promoting the assignment and re-insurance spoken of. (3) The action of Priest, thus paid for, was what he did in his capacity as director; and whatever was thus paid to him for that action became the property of the company whose director he was. Perry on Trusts, secs. 206-7; *Gaskell v. Chambers*, 26 Beav. 360; Story's Eq. Jur., sec. 1564. (4) As to the defence of the statute of limitations, it cannot prevail. The "ratifications" were exchanged after the middle of January, 1874. The bonds were turned over at least as much as three or four weeks afterwards—(Peck says from four to six weeks)—and presumably much later. It is shown by the record that Wyman (who, besides being the partner, was the *alter ego* of Priest) chafed at the delay made by Peck. He wanted the money. He wanted the gas light bonds. He was disappointed in getting either. He finally, in despair of anything better, took these railroad bonds. If the interval between the exchange or ratification and the delivery to Wyman of the bonds was five weeks, this suit, which was begun on February 19, 1879, was within the five years.

BLACK, J.—In 1873, the superintendent of insurance began proceedings to wind up the St. Louis Mutual Insurance Company, which was not then in a satisfactory condition. Most of the directors regarded a reinsurance as the best way out of the difficulty. Efforts were made to that end, including negotiations with the Mound City Life Insurance Company. Charles H. Peck, who was a large stockholder in the St. Louis Mutual, but not a director or officer, made proposals to some of the officers of the Mound City to bring about such an arrangement, the result of which was a contract between Peck and the president of that company, dated the twenty-seventh of November, 1873, by which, after reciting the desire of that company to effect the reinsurance, and the deemed

necessity of Peck's services to accomplish that object, the company agreed to pay him $155,000 within sixty days, for which sum Peck was to "devote his services for the procurement of such reinsurance and effecting a contract between said companies."

Peck thereupon approached the defendant, a director of the St. Louis Mutual, who at first did not take much interest in the matter. Peck, then, in substance, stated that he was largely interested in having the reinsurance effected ; that it was worth ten or fifteen thousand dollars to the stockholders of the St. Louis Mutual, and that he meant business.

Priest and Wyman were partners in the real estate business and upon Peck's suggestion that his business was legitimately within the partnership business, Priest referred Peck to Wyman, who was at a desk in the same room or office. The result of the negotiation between Peck and Wyman was that the former placed bonds of the Leavenworth, Atchison & Northwestern Railroad Company of the par value of fifteen thousand dollars in the hands of Mullikin to be handed to Wyman, if the reinsurance was effected, otherwise they were to be returned to Peck. This agreement was in writing, but was subsequently destroyed. The evidence, including a letter from Peck, shows that he agreed within thirty days to substitute money, or bonds of the Vulcan Iron Company, or St. Louis Gas Light Company, for these railroad bonds, the latter, it is said, then being worth but sixty cents on the dollar.

As the Mound City Insurance Company then stood, the superintendent of insurance did not regard it strong enough to make the reinsurance, and it was required to add a half million dollars to its capital stock. In December, 1873, a contract of reinsurance was made by the St. Louis Mutual with the Mound City, the latter also stipulating that for a transfer of all of the assets of the St. Louis Mutual it would assume all the liabilities of

that company, increase its own stock a half a million dollars, and out of this increased stock exchange its own stock for that of the St. Louis Mutual. Of the twenty directors of the St. Louis Mutual, seventeen, including the defendant, voted for the measure. The Mound City increased its stock as agreed, the reinsurance was approved by the superintendent of insurance and by the court in which the proceedings against the St. Louis Mutual were pending, and those proceedings were dismissed. By the seventeenth of January, 1874, the whole contract was substantially completed. Peck received his agreed compensation from the Mound City Insurance Company in secured notes which that company acquired by the assignment from the St. Louis Mutual. Peck would not, at least did not, substitute money or bonds of the Iron Company, or Gas Company, as he had agreed, for the railroad bonds in the hands of Mullikin, and Wyman, unable to do better, took those bonds. In August, 1874, Priest and Wyman dissolved their partnership, at which time Wyman handed over to Priest the one-half of the railroad bonds.

The conclusion from all the evidence is irresistible that defendant agreed to and did advocate and vote for the assignment and reinsurance, in consideration of the arrangement between Peck and Wyman. At all events the bonds were given to secure defendant's active influence in favor of the measure, though without this he might not have been hostile to the transaction.

In 1877 the superintendent of insurance commenced new proceedings against the St. Louis Mutual Life Insurance Company, and plaintiff was appointed receiver. By this suit he seeks to charge the defendant as a trustee of all the railroad bonds. The circuit court so held and decreed as to the one-half received by the defendant, and on his refusal to produce the same, entered a money judgment for the estimated value. From this

judgment the defendant appealed. Plaintiff took a writ of error. In like manner both parties come to this court from the court of appeals, where the judgment of the circuit court was affirmed.

1. An agent or trustee cannot unite in himself the opposite character of buyer and seller, and if he does the profits may be charged with a trust for the benefit of the principal, unless the latter confirm the transaction with full knowledge of all of the facts. So, too, if the agent make gains from the use of the trust funds or property he must account therefor. We need not cite authorities from this and other courts to support these plain propositions. Again, if the agent accept any benefits in conducting the business of his principal he will hold them in trust for the principal. Story on Agency, sec. 211 (8 Ed.); Perry on Trusts, sec. 206; *Jacobus v. Munn*, 37 N. J. Eq. 48.

The directors of a corporation occupy a fiduciary position. They are trustees and agents of the corporation and stockholders. In general they are governed by the same rules as are applied to trustees and agents. *Parker v. Nickerson*, 112 Mass. 195; *Ry. Co. v. Poor*, 59 Me. 277; *Ry. Co. v. Hudson*, 19 Eng. L. & Eq. 365. In Perry on Trusts, at section 207, it is said: "And so all advantages, all purchases, all sales, and all sums of money received by directors in dealing with the property of the corporation, are made and received by them as trustees of the corporation, and they must account for all such moneys or advantages, received by them by reason of their position as trustees." Defendant does not seriously controvert these general principles of equity jurisprudence, but he insists they have no rightful application to this case, because the bonds were never made a part of the assets of the St. Louis Mutual, did not constitute a part of the consideration, avowed or concealed, paid by the Mound City, and were not made by him in the legitimate business of the corporation. He relies with

full confidence upon *Tyrrell v. Bank of London*, 10 H.
L. C. 26.   The substantial facts of that case were these:
The bank had been recently organized, and Tyrrell was
its solicitor.   Mrs. Campbell owned certain property,
upon a part of which was situated a building known as
the Hall of Commerce.   Read had a contract with her
for the purchase of the whole property at £49,200.
Tyrrell and Read formed a combination to sell the
property to the bank at an advanced price, and Tyrrell,
for his influence, was to have a one-half interest in the
contract, which Read had with Mrs. Campbell.   Tyrrell
kept the agreement secret from the bank, at the same
time urged the bank to purchase, professing to act for
it as solicitor.   Eventually the bank purchased the Hall
of Commerce part of the property at £65,000.   Out of
this Mrs. Campbell was paid, some litigated claims were
settled, and the balance was paid to Read, who divided
the profits with Tyrrell, each making some £6,000, and
had left also the unsold portion of the property, alleged
to be of the value of £8,000.   The suit was brought by the
bank against Tyrrell and Read.   The master of the
rolls dismissed the bill as to Read, and decreed Tyrrell a
trustee for the bank of all interest acquired in the prop-
erty, accounts were directed to be taken, and Tyrrell was
ordered to convey to the bank his share in the property
not sold to the bank.   On appeal, prosecuted by Tyrrell,
the decree was modified in form.   The Lords considered
that Tyrrell could not be decreed a trustee of the unsold
portion of the property, and should not have been
directed to convey that to the bank, because, as was said,
the limit of the agency of Tyrrell, the extent of his
obligation, and the relation of solicitor and client, were
to be ascertained by the extent of the property sold by
Tyrrell to the bank.   The Lord Chancellor very clearly
states that Tyrrell could only be a trustee as to that
portion of the property sold to the bank, and as to that
he should make no gain.   He proceeds to say the object

which the master of the rolls has in view is to be accomplished in another way: "Tyrrell must receive from his clicnts, in his character of vendor to his clients, only that sum of money which, as between him and Read, Tyrrell must be taken to have paid for the property conveyed to his clients, but that sum of money must be ascertained in the following way: By deducting from it the value of the unsold property included in the contract between Read and Tyrrell, but not included in the contract of sale to the clients."

The bank among other things contended, that assuming Tyrrell's agency as to the bank was confined to the Hall of Commerce part of the property, still the circumstances showed that he received the share in the rest as a bribe, and for that reason the bank was entitled to a conveyance of it. As to this contention, Lord Chelmsford said: "No authority has been adduced in support of such a proposition, and I do not think it can be maintained. In order to simplify the question, let it be supposed that Tyrrell had acquired no interest in the property, but that Read had offered him £5,000 to induce the respondent to purchase, and that they had been persuaded by Tyrrell to buy at an excessive price. Of course, they might have rescinded the contract, but could they in any manner have obtained the £5,000 on the ground that it belonged to them? If, by reason of the agreement between Read and Tyrrell, the respondent had been prevailed upon to give too large a sum for the property, they might have maintained an action on the case against both the parties to the imposition upon them, and have recovered damages; or they might have sued their agent, Tyrrell, for damages arising from the breach of duty, and they would probably have received an amount equal to the sum which he had improperly received as a fair measure of the injury which they had sustained. But the £5,000 itself, as a specific demand, they could in no manner have recovered. The unsold

part of the property in the same manner cannot be directly reached by any proceeding of the respondent." These remarks of Lord Chelmsford, if detached from the facts of that case and the decree actually made, appear to give some support to the defendant's position here.

The solicitor could be regarded as the agent of the bank only so far as the bank became the purchaser; beyond that he had a right to deal for himself; yet the decree as modified did not allow him to make any gain out of the transaction taken as a whole. He was allowed to keep the unsold portion, but its value was deducted from the amount which he was allowed to receive from the clients in the statement of the account. Practically, there was little, if any, difference between the decree as made by the master of the rolls and as modified, in its effect upon the parties, and this seems to have been conceded in terms by Lord Cranworth. The facts there in judgment and the decree even as modified, do not furnish, a precedent in defendant's favor.

Where a trustee retired from his office in consideration that his successor paid him a sum of money, it was held that the money so paid should be treated as a part of the trust estate, and be accounted for as such by the retiring trustee, on the ground that he could make no profit directly or indirectly from the trust property, or from his office of trustee. `Sugden v. Crossland,* 3 Smale & Giff. 192. In *Gaskell v. Chambers,* 26 Beav. 360, it appears the Eagle Insurance Company desired to buy out the business of the London Mutual Insurance Company, and agreed to and did pay a specific consideration therefor, and, by a secret agreement with the directors, agreed to and did pay to them the further sum of four thousand pounds as a compensation for the loss of their officers. These directors were held to be trustees for the corporation, and it was also ruled that they received that sum by reason of their position as trustees and must account therefor.

These cases are all quite clear to the effect that the trustee will not be allowed to make gain to himself, beyond his allowed compensation, by reason of his office and influence as such trustee. By accepting the office the director undertakes to give his judgment and influence to the interests of the corporation in all matters in which he represents or professes to represent it. That judgment and influence, of right, belongs to the corporation, and so does that which it produces, and the bonds received by the director are its property, as between it and the defendant. The circumstance that they came from Peck, and not directly from the Mound City Insurance Company, is wholly immaterial. They came from the agent of that company, and the extravagant amount paid Peck impresses one with the notion that more than fair commissions was included in the $155,000. However that may be, what the director makes in his office as such belongs to the corporation. It will not do to clog these principles of law applied to principal and agent, trustee and *cestui que trust*, with exceptions and modifications. They must not be whittled away. Whatever may be the practice in such cases, the agreement by which the bonds were acquired was an illegal contract, as well as a plain breach of duty. No court, it is true, would aid the defendant or the receiver, or the corporation of which he is the receiver, in recovering the bonds from Peck, for that would be to execute the illegal contract. Neither would a court assist Peck in recovering them back after the transaction was completed. So, too, an agent may resist an accounting on the ground that the subject of the agency was illegal, or against public policy. Story on Agency, sec. 235. But when the subject of the agency is entirely legal, and that was the case here, and profits are made by a violation of duty, it would be obviously unjust to allow the agent to reap the fruits of his own misconduct. *Id.*, sec. 207. An agent is accountable to his principal for moneys that came

into his hands as such, even if such amount be composed of usurious interest, and not collectible by the principal himself. *Chinn v. Chinn*, 22 La. Ann. 599. One party cannot hold back proceeds from another, of whom he was representative, on the ground that there was illegality in the way of getting the money. Whart. on Con., sec. 354. The defendant acquired the bonds while acting and professing to act in his capacity of director, and must be held to have received them in that capacity. The plaintiff's case is made out by the proof of these facts, and we are not concerned in the execution of the illegal agreement.

2. As to the writ of error prosecuted by the receiver we do not see that he has any right to the bonds which never came to the defendant. Wyman, who acquired them, is no party to this suit, and held no fiduciary relation to the plaintiff's corporation. The receiver has elected to take the course here pursued and must be content with such property as it will reach.

3. This suit was begun February 19, 1879, five years and ten to fifteen days after Wyman received the bonds for himself and defendant. The agreement by which the bonds were acquired and the receipt of the same are facts which were kept secret from all persons save those directly connected therewith, until 1878, when rumors were afloat pointing to these facts. They were then brought to the attention of the court and soon thereafter this suit was begun. Defendant pleaded the five year statute of limitations, and plaintiff replied that the fraud was not discovered until within five years next before the commencement of the suit. Section 3230, Revised Statutes, specifies five different classes of civil actions (other than those for the recovery of real estate) which can only be commenced within five years after the cause of action shall have accrued. The fifth is: "An action for relief on the ground of fraud, the cause of action in such case to be deemed not to have accrued

until the discovery by the aggrieved party, at any time within ten years, of the facts constituting the fraud.''

Our statute of limitations applies to equitable, as well as legal causes of action, and we agree with counsel for the defendant that this clause under consideration should be considered in the light of the former equity rules, the place of which, in many respects, at least, it was designed to take. Beyond doubt the statute does not now and never did run against an express continuing trust in favor of the trustee, certainly not until he openly repudiates the trust. *Johnson v. Smith*, 27 Mo. 591; *Smith v. Ricords*, 52 Mo. 581; s. c., 56 Mo. 553. Conceded it must be that by the equity rules, the statute was not applied by way of analogy, in cases of actual fraud, until the discovery of the fraud. But is it true, as is contended here, that by those rules the statute was applied without regard to the time of discovery in case of constructive frauds and trusts? It was said by Scott, J., in *Keeton's Heirs v. Keeton's Adm'r*, 20 Mo. 541: "In cases of resulting, implied and constructive trusts, where a party is to be constituted a trustee by a decree of a court of equity founded on fraud, it is well settled as a rule of equity, that the statute of limitations, and presumptions from lapse of time, will operate. With regard to the statute of limitations, it will run from the time that the facts are brought home to the knowledge of the party." See also Perry on Trusts, secs. 228 and 230; 1 Dan. Ch. Plead. 669; *Hunter v. Hunter*, 50 Mo. 445; Angell on Lim., sec. 470. In the case last cited the defendants were the uncles and agents of the plaintiffs for the management and sale of the lands; they purchased the lands, with the value of which plaintiffs were not familiar, at an under value; they then sold the same at an advanced price. It was a suit to establish a constructive trust for the profits arising from the re-sale. It was there said: "If a party is in possession of, or has notice of, the main

facts constituting the fraud, the statute will commence running from that time." The difference of opinion expressed in that case and the subsequent one of *Rogers v. Brown*, 61 Mo. 187, is not pertinent to any inquiry here, for this case in no way concerns real estate.

Many authorities do hold that in cases of constructive trusts and frauds, the statute will begin to run without regard to the time of the discovery. This appears to be due to the fact that often in such cases the facts are open and the law frequently draws its conclusion without regard to the motives, because of the confidential relation of the parties. Much, we think, depends upon the fact whether the fraud is a secret or open one. If the substantial facts constituting the fraud, in cases like the one under consideration, were open, it is believed, under the equity rules, the statute of limitations would have been applied at once, but if these facts were in their nature secret and were unknown, it is believed the statute would not begin to run until they were discovered, there being no want of diligence on the part of the complainant. Here the fraud consists in professing to act for and in the interest of the corporation, as was defendant's duty, when, in reality, he was acting for himself and for his private gain. The agreement under which this was done was in its very nature a secret one, one which the corporation would not naturally suspect, and one which would not be revealed by any act openly done. Of course, here, simple knowledge of the existence of the agreement and acquisition of the bonds thereunder, brought home to the plaintiff, or the corporation of which he is receiver, would start the statute and from that time it would continue to run notwithstanding the subsequent appointment of the receiver. This knowledge was not acquired until much more than fifteen days after the receipt of the bonds, by Wyman. The circumstances by which the transaction was discovered show there were no *laches* on the part of

the plaintiff or his corporation.   We conclude the clause of the statute before noted applies to this case, and under it the cause of action is not barred.

4.   A contract founded on a champertous consideration is illegal, against public policy and void.   *Duke v. Harper*, 66 Mo. 55.   In that case the contract there in question was held not to be champertous because the attorneys did not bind themselves to pay any portion of the expenses of the litigation.   Where the right of the plaintiff, which he seeks to enforce, is derived under a title founded on his champerty, the suit must fail. Courts are not organized for the purpose of enforcing such contracts.   Many of the authorities cited by defendant go to this extent and no farther.   Some of them do appear to hold that where there is a champertous contract, by which the suit is prosecuted, and that fact comes to the knowledge of the court, it should dismiss the suit.   *Barker v. Barker*, 14 Wis. 143 ; *Webb v. Armstrong*, 5 Humph. 379.   Others appear to give a qualified approval to the doctrine.   On the other hand a number of cases hold that the fact that the suit is being prosecuted under a champertous contract is no defence, and that the illegality of such a contract can only be set up when it is sought to enforce the contract.   *Hilton v. Woods*, 4 L. R. Eq. Cas. 432 ; *Whitney v. Kirtland*, 27 N. J. Eq. 333 ; *Allison v. Ry. Co.*, 42 Iowa, 274 ; *Courtright v. Burnes*, 3 McCrary 60.   Unless the plaintiff's title, by which he seeks to enforce a right, is infected by a champertous contract, we see no reason why the suit may not proceed, though such a contract exists as between the plaintiff and his attorney.   It is time enough to turn a party out of court when he asks the aid of a court to enforce such a contract.   This is, in substance, the rule as to most illegal contracts, and there is no good reason at this day for making an exception in this class of contracts.

Certain policy holders brought to light the facts

upon which this suit is founded, and were permitted by the court to prosecute the same in the name of the receiver upon indemnifying him, and, as a consequence, the funds in his hands, against the payment of costs. These policy holders were but protecting their own rights. They could not well sue in their own names. In such cases it is not an uncommon thing for cautious courts to require that the officer be made safe against costs of long and tedious suits. Thus far there is no element of champerty in the defence. It would seem the defendant offered to prove that the attorney by whom the suit was instituted and who represented these policy holders, gave the bond, and, further, that he had an agreement with the receiver by which he was to have a certain portion of the avails of the suit for his services. In view of this offer let it be conceded, for the purposes of this case, without deciding the question that the agreement between the attorney and the receiver was champertous, still, applying the principle before announced, that constituted no defence to this action. The receiver's accounts will come before the court for its approval and it will be time enough then to examine into the question of the validity of the agreement. The plaintiff is in no wise affected by the illegal agreement, even if any there was. We do not think public policy requires the courts to turn aside and investigate such side issues.

The judgment in this case, from which both parties come to this court, is affirmed. Henry, C. J., dissents. The other judges concur.